PITMAN, J.
_JjA unanimous jury convicted Defendant' Robert J. Moody as charged of forcible rape. The trial court sentenced him as a second-felony habitual offender to 55 years at hard labor without benefit of probation or suspension of sentence. For the following reasons, we affirm Defendant’s conviction. We vacate his sentence and remand for resentencing.

FACTS' "

On November 8, 2012, the state filed a bill of information' charging Defendant with one count of forcible rape in violation of La. R.S. 14:42.1,[1] stating that, on or about October 6, 2012, Defendant had vaginal sexual intercourse with M.S.[2] without her lawful consent because she was prevented from resisting the act by force. On November 8, 2012, Defendant pled not guilty.
On January 6, 2014, the state filed a 404(B) notice, stating that it intended to use the following other crimes evidence at trial:
The original police report that was tendered in discovery on May 8, 2012 alleg *1034 es that the defendant refused to stay away from the victim. That report also indicates that the victim had to seek help from the Shreveport Police Department for a previous incident[.'J
A hearing was held on January 8, '2014, at which M.S. and her mother, Henrietta Samuels, testified about an incident that occurred on June 6, 2012, |ai.e., Defendant forced his way into their home while M.S., who was a minor at the time, was home alone. The tria! court found that the evidence of the June 6, 2012, incident was admissible under La. C.E. art. 404(B), specifically for the purpose of proving intent and/or a pattern.
On January 8, 2014, the state filed a motion in limine to prohibit the defense from referring to or questioning a victim of a sex crime about other sexual partners or an alleged pregnancy. The trial court granted this motion.
A jury trial began on January 14, 2014. M.S. testified that she first met Defendant in December 2011 when she was 17 years old and he was 28 years old. She stated that they began as friends and were then in a four-month relationship. M.S. admitted that she did not tell her mother about their relationship because her mother disapproved of their age difference. M.S. further stated that, during their relationship, Defendant .came over to her house approximately 14 or 15 times. She' explained that, at the beginning of their relationship, they had no problems, but toward the end, the relationship changed. M.S. noted:
It was like towards the end of the relationship. He said to me — well, I didn’t want to. have sex. with him, and he said that he felt like I didn’t love him anymore, or something like that, because I didn’t want to have sex with him.
She explained:
At that point, I felt like that I didn’t have to have sex with him to prove that I loved:him, and I felt like if that’s how he feels, then I really didn’t need to be with him.
M.S. testified that, in response, Defendant became upset and mad, acted controlling and always wanted to know her activities, her companions and her location. She stated that the combination of these things led to her Rending the relationship. She further testified that she never tried to contact Defendant again and changed her phone number and blocked him on Face-book, but he continued to call her phone and her friends’ phones.
■ M.S. testified regarding an incident that took place in June 2012 after she and Defendant had been broken up for approximately one month. Defendant came over to her house and knocked on the door, but refused to. leave when she told him to leave. She stated that she called her mother and told her that Defendant was at their house, so her mother called Defendant’s phone and asked why he was theiu M.S. stated that she could hear their phone conversation and Defendant denied being at their house, and she confronted him about his lie. She stated that Defendant then left, but returned a few minutes later, removed a screen from the kitchen window and climbed into the house through the window. M.S. called her mother, who then called the police; M.S. testified that she pushed and hit Defendant to try to stop him from coming in through the window and that there was a struggle between them with her hitting him and him holding her arms and pushing her. Defendant asked her why she would not talk to him and she continued to tell him to leave the house because he was not supposed to be there since both she and her mother had. previously asked him to stay away. M.S. further testified that she tried to call her mother again, but Defen *1035 dant grabbed her phone and left the house. She then used a different phone to call her mother, but her mother arrived at the house at that time.- She stated she told her mother that Defendant had left, so -her mother drove away,- and then the police arrived. M.S. further stated that she and her mother |-.tsubsequently: filed a police report, but did not press charges; however, they requested that the police officers tell Defendant'that he was not to come back to the house or be around M.S.
M.S. testified that between the June 2012 incident and the October 6, 2012, incident, Defendant continued to contact her, noting that one week before the latter incident, Defendant came running up behind her as she exited the school bus. He asked her to talk to him, but "she refused. She stated that Defendant followed her home,, but her neighbors saw Defendant and came over to persuade him to leave. Her neighbors made sure she got inside her homo safely, but Defendant began knocking on her door. Another neighbor came to her house to help and Defendant left after approximately 20 minutes.
M.S. testified that, on October 6, 2012, she was asleep in her bedroom when she heard someone knocking on her- bedroom window. She walked to -the living room and saw Defendant walk up - to the house and remove the screen from a kitchen window. She stated that she then went -to the hallway to get a -bat; and, when she returned to the kitchen, Defendant was trying to come into the house through the window. She began hitting Defendant on his shoulders and the side of his head with the bat in an attempt to keep him out of the house. She stated .that' he made his way inside, grabbed the bat-and told her to talk to him. They struggled as she tried to get him to leave ■ the house. She dropped the bat and ran toward the front door, but Defendant grabbed her from behind, pushed her into a door Janear the hallway, pulled her into her bedroom and then, “slung” her onto her bed. M.S. testified: .
Next, he-gets on top .of me and-he — I was screaming at that point saying, stop, and get out. And I asked him why was he there, why was he doing that, and he told me to be quiet and shut up. He put his hand over my mouth.
[[Image here]]
It was ... a lot of pressure, but not — ■ like, I could still breath a little, but it was pressure.
[[Image here]]
He was on top of me, trying to pull my pants down. ■'
[[Image here]]
I kicked him off of me." He kind of fell off the side of the bed, and I got’up, and he pushed me back down on the bed. And at that point, I was still screaming, and he pulled my pants down.
[[Image here]]
And I had my legs closed really tight, and he was trying to get them open. It took him about, maybe, eight minutes because I was still hitting him and pushing him off, trying to get him off of me. So, it took him a while. And after that, that’s when ...
[[Image here]]
Next, he pulled his pants down, and that’s when he penetrated me vaginally.
[[Image here]]
And that was for about five minutes.
[[Image here]]
And I was crying at that point, and I felt pain- in. my lip, so I touched it to see, like, was-1 bleeding, or anything. And when -I touched my lip, I could see blood on my hands, so I knew that my lip was bleeding. So I asked him to let me go to the bathroom,-'and-he did, but he followed me in the bathroom. ■
*1036 M.S. further stated that, while she cleaned the blood off her lip, Defendant: asked her if she loved him’ and why she would not talk to him. She stated that she then left the bathroom, put her pants back on and tried again to leave the house through the front door. She testified:
And he pushed me into my mom’s room on the floor. And when he pushed me on the floor, I started screaming, and he told me to shut the “F” up. And he slapped me, at that point.
And I asked him, why was he doing that to me. And I was on the floor. He was on top of me, holding my arms down. And | (¡again, he tried to take off my pants again, and I wouldn’t let him. So, he started hitting me and punching me. He hit me in my stomach and he punched me in my legs, in my thighs, to get my legs open. .
[[Image here]]
And after, that, for about maybe ten minutes, I just gave up.
[[Image here]]
He pulled down my pants and, again, he penetrated again.
[[Image here]]
Vaginally.
[[Image here]]
After that, he got up and he put his pants on, He said that — he said from that “F” word; he1 didn’t care what happened. He didn’t care who I told. He didn’t care if he went to jail.
M.S. stated that Defendant then left the house, pulled the window back down, replaced the screen on the window and drove away, after which she called her. mother and the ^police. She spoke with persons from the fire department and police officers. She was quiet and scared, but she answered the questions asked by the officers; M.S. testified that her mother drove her to the hospital, where she spoke with a nurse, a detective and an advocate. She spent approximately four hours with the nurse, during which time the nurse interviewed her, she wrote down everything that happened, the nurse performed an examination on her and photographs were taken of her. On cross-examination, M.S. testified that, before the October 6, 2012, incident, she and Defendant had never had sexual intercourse.
Henrietta Samuels, M.S.’s mother, testified that she knew Defendant as a “phone” friend of- M.S. She stated that, in June 2012, she was at work when M.S. called her and said that Defendant was trying to break into their house. She called Defendant’s phone and .asked him to never come back to their house and to have nothing more to do with her daughter; and Defendant responded that he was not at her house, but was down the street. |7Ms. Samuels further stated that she could hear her daughter in' the background asking, “Why are you lying?” She also stated that she later called M.S. to ask if Defendant had left, and she instructed M.S. to call the police. After receiving permission to leave work, she called the police during her drive home. When she arrived home, M.S. told her that Defendant was gone, so she drove away to look for him and saw him a block away from her house. She testified that she spoke to Defendant and asked him why he broke into her house, requested that he return M.S.’s phone and informed him that she had called the police; Defendant denied that he had M.S.’s phone and alleged that M.S. had hit him and that he did' not care thát she had called the police. Ms. Samuels further testified that she then returned to- her house and met with police officers, and saw that one of her window screens had been tom off. She informed the police officers that she did not want to press charges against Defendant, but requested that they advise him to not have any further contact with *1037 M.S. She stated that, 'as a mother, she did not want Defendant’s mother to bear the burden of seeing her child in prison. She noted that, after this incident, she spoke to Defendant’s mother and asked her to talk to Defendant about staying away from M.S. and not contacting her. . . .
Ms. Samuels also testified regarding the October 6,2012, incident, stating that, during the late morning while she was at work,' she received a phone call from M.S. saying that Defendant had broken into their house and raped her. Ms. Samuels stated that she immediately left work and drove home, where she found that police and paramedics were there. She also Isobserved that the screen on a window had been removed. Ms. Samuels testified that M.S. was “hysterical,” “terrified, scared” and “shaking and nervous and crying a little bit” when she was speaking to law enforcement officers. The paramedics and police officers offered to take M.S. to the hospital, but M.S. preferred that her mother take her, so a police officer followed their car to the hospital. .
Angel Betford testified that she was a school friend of M.S,. and knew Defendant through M.S. She stated that she was aware that Defendant and M.S. were dating and were in a boyfriend — girlfriend relationship for approximately seven months before M.S. ended the. relationship. Ms. Betford testified that, after the relationship endpd, Defendant contacted her to relay a message to M.S. that he missed her and loved her and wanted to get back together with her. She stated that she gave M.S. -the message and that M.S. did not care and .did not want, to speak to Defendant. She further noted that, for three to four weeks thereafter, Defendant called her approximately once a day to talk about M.S.
Officer Eric Powell of the Shreveport Police Department testified that during the early hours of June 7, 2012, he responded to. M.S.’s home after she reported that her ex-boyfriend, i.e., Defendant, came into her house and took her cell phone. He stated that M.S. told him that Defendant had her cell phone, that she wanted it back and that she and her mother did not wish to press charges; however, Ms. Samuels did not want Defendant to come back to her house. Ofc. Powell further testified that he then went to the address provided by M.S. and Ms. Samu-els. He stated that a woman 19allowed him and another officer inside the house, where Defendant was sitting in the living room. Ofc. Powell stated that Defendant was “passive resistant” and at first refused to follow their commands to stand up. He stated that the other officer grabbed Defendant and placed him in handcuffs, and they led him outside and patted him down as a safety precaution. Ofc. Powell noted that Defendant had a cell phone in his hands and an additional phone in his back pocket that matched the description of M.S.’s phone, which had a photo of M.S. on the locked screen. He took M.S.’s phone and told Defendant that M.S. and Ms. Samuels did not want him to return to their house. Ofc. Powell stated that he explained to Defendant that he could' be arrested if he disobeyed and returned to the house. Defendant responded that he understood, and the officers released him. Ofc. Powell testified that he then returned the phone to M.S;
Corporal Brad Sotak, a patrol officer with the, Shreveport Police Department, testified that, on October 6, 2012, he responded to a complaint from M.S., who appeared “disheveled” and whose eyes were red and “face was puffy, as if she had been crying for awhile.” He noted .that she had “a little bit of a swollen red lip ... that was fresh.” Cpl. Sotak testified that M.S. told him that her ex-boyfriend, i.e., *1038 Defendant, showed up at her house unannounced and uninvited and climbed through a kitchen window to enter the house after she repeatedly told him not to come in; He stated that M.S. said that she got an aluminum bat and hit Defendant in the head to try to prevent him from coming in, but he was able to fend her off and enter the house. He further stated that M.S.' told him that, once Defendant entered the I mhome, she continually told him to leave and threatened to call the- police, but Defendant responded that he just wanted to talk to her, that he did not care if she called the police and that he would go to- jail. Opl. Sotak testified that M.S. told him that she tried to leave the house, but Defendant grabbed her from behind, threw her against the. wall, drug her into her bedroom, threw her onto her bed, and then held her down with one hand over her mouth and the other hand holding her wrists or arms down. M.S. told him that she kicked and screamed and tried to fight Defendant off, but Defendant put .his forearm across her neck or throat and she could not breathe. .Opl. Sotak further testified that M.S. stated that Defendant pulled his pants down and vaginally penetrated her. He stated that M.S. told him that she tried to leave, but Defendant pushed her into a wall and she fell to the floor. He .got on top of her; and, as she struggled to get away, he raped her again and then left the house. Cpl..Sotak also stated that, as a result of observing. M.S.’s demeanor, he found her to be the victim of multiple' rapés. As per police department policy, he notified his superior and sex crimes detectives. He then followed -the vehicle transporting M.S. to the hospital and waited outside her examination room until a detective arrived.
Melanie Hubbard, a registered nurse and Sexual Asáault Nurse Examiner, testi-fled that, on the afternoon of October 6, 2012, after being notified of a sexual assault victim in the emergency room, she met with M.S. and performed a sexual assault examination, which included interviewing her, doing a physical examination, collecting evidence and taking photographs of her. Nurse Hubbard described M.S.’s demeanor In during the interview as “very quiet and tearful.” She noted that M.S. had a. cut on the top of her lip that had dried blood on it and that the palm of M.S.’s right hand was red. Nurse Hubbard stated that she did not notice any other bruising, but explained that it is normal for bruising, not to immediately appeal’.
Katie Traweek, a forensic DNA analyst for the North Louisiana Crime Lab, testified that she analyzed the evidence collected in M.S.’s physical evidence recovery kit as well as reference swabs taken from M.S., and Defendant. She stated that spermatozoa and prostate specific antigen were present on the following swabs taken of M.S.: the genitalia swab, perineal[3] swab, vaginal swab and cervical swab. She also noted that semen was present in the vaginal washings. Ms. Traweek- also testified that the sperm fraction-found on the cervical swab was consistent with the DNA profile obtained frdm the reference sample of Defendant. She stated that the probability of finding the same DNA profile, if the DNA had come from a randomly selected individual other than Defendant, was approximately 1 in 470 sextillion. She also noted that the sperm fraction and the epithelial fractions of the external genitalia swab were consistent with the DNA profile obtained from the reference sample of Defendant.
Detective Michael Jones of the Shreveport Police Department testified that, on *1039 October 6, 2012, Cpl. Sotak[4] contacted him in reference to a sexual .assault. Det. Jones stated that he met M.S. at the hospital and | ^described her demeanor as “quiet and reserved” and “upset.” He took a recorded statement from M.S. of the events of that evening and noted that she had a busted lip. Det. Jones further stated that, on October 10, 2012,' he made contact with Defendant and advised him of his rights per Miranda, He-noted that Defendant consented to the collection of his DNA; and, without being prompted, Defendant asked him if the investigation had to do with the rape of M.S. Det. Jones stated that, during the interview,Defendant’s story changed approximately 20 times, that he appeared to be hiding something and that he was not very forthcoming. Defendant first denied going to M.S.’s house on the date of the alleged rape, but then admitted that he had gone to her house to get a hair dryer. Det. Jones noted that Defendant also gave inconsistent information about when he had last seen M.S., whether she wanted to get back together with him, whether M.S. had ever been upset with him, how long he was at her house, what they’ talked about,whether there was a physical altercation and whether he and M.S. were still in a relationship. He further noted that Defendant pointed out “a knot on his head” where M.S. hit him with an aluminum bat.-Det. Jones testified that Defendant told him that he and M.S. had sex, but implied that it was consensual. Det. Jones stated-that, after the interview, he placed Defendant into custody and arrested him. On cross-examination, Det. Jones clarified that Defendant denied raping M.S.
Defendant chose to testify at trial. Near the beginning of Defendant’s testimony, outside the presence of the jury, the trial court explained to Defendant that he would not be allowed to testify about any alleged sexual I,¡¡conduct between M.S. and any person other than himself or about M.S.’s possible pregnancy. Initially, the trial court stated its intent to allow Defendant to testify about his alleged prior sexual conduct with M.S., and Defendant argued that the prosecutor had brought up that subject on direct examination. The prosecutor requested, pursuant to La. C.E. art. 412, that the trial court prevent Defendant from testifying .about his alleged sexual contact with M.S. .prior to the date of the offense. After reviewing the recording of M.S.’s direct examination, the trial court concluded that the prosecutor never specifically asked M.S. whether she had ever had sex with Defendant and determined that La. C.E. art. 412(B) applied. The trial court further noted that Defendant never filed a motion under La. C.E. art. 412(D) to have the evidence admitted-at trial, so it ordered Defendant not to discuss any prior sexual. conduct between himself and M.S. Defendant objected to the trial court’s ruling.
Defendant testified that he met M.S. online through one of her friends. He stated that, on October 6, 2012, he went to M.S.’s house, both to retrieve his mother’s hair dryer and to talk to M.S. about their relationship. He said M.S. answered the door with a bat in her hand demanding to know what he wanted. He testified that he told her .he just wanted to talk, and M.S. sighed and let. him in. He denied that he entered the house through a‘window. Defendant testified that he and M.S. talked, but got into a heated argument. He was able to “talk her down,” and they walked into her bedroom together, got onto the bed and watched television.
|uHe explained:
*1040 We were on the bed, we were watching TV, Desperate Housewives, or something else. We were talking to each other. We got freaky. I touched her, she' touched me. We started' kissing. As we’re kissing, I end up picking her up, walking around the house, bumped into the wall, fell on the floor.
After that, got up, things was over. We were sitting on the end of the bed, and I asked her — I 'mean,'things was on the bed — we was sitting on the bed. I asked her a few questions; and she denied them. We got back up, she started forcing me out of the house. I was talking to her. I’m like, I was wrong,: why are you doing this, why are you doing this?
So she grabs the' bat. She grabs the bat, then I’m trying to talk to her. I said, Just calm down, just calm down. You never ‘been like this. Why you talking to me like this? You never called me that name, you never called me a cuss word, or called me out' of character. So let’s just talk. We- can just talk about this.
She saying, I don’t care, just get out of my house. She swung — swung at me. I raised my arm up to block it. Instead of hitting her, I grabbed the bat, threw the bat on the floor, and I held her to restrain — keep her from hitting me, because she started to swing fists, and I held her. And then I asked her, So, is it true you really don’t love me no more? And she said, No, I do not love you. ' I 'do not love you anymore. Right then, when she said that, I was hurt. I was hurting. I had felt like a [sic ] put a lot into it. I looked her in the eyes, and she had a look in her eyes like, I can’t lure him back over no more. I can’t lure him back over my house anymore. This may be the last time he may ever come back over my house.
So I just turned around, walked out of • the house, and never said nothing since then, and left.
Defendant then further detailed their sexual encounter, testifying that it was consensual, and .continued while the two were standing up and walking around and he was carrying her. He said that they bumped into things and at one point, they fell to the floor. Defendant denied holding his hand over | lfiM.S.’s mouth. He stated that she never told him to stop or that she did not want to. have sex. Defendant testified that M.S.’s testimony was not completely true and denied that he lied to Det. Jones. He admitted that he had been convicted in Texas of aggravated robbery in 2004 and was imprisoned for five years. He concluded by repeating that the sexual encounter with M.S. was consensual and by denying that he raped her.
On cross-examination, Defendant testified that he believed that he and M.S. were still in a boyfriend-girlfriend relationship on October 6, 2012, when he went to her home, because they were still in contact by phone. However, he admitted that he had not actually seen M.S. for three months prior to this date. Further, he stated that he- had to communicate with M.S. through Ms. Betford because things were “heated” with M.S. and he wanted to “let her cool off.” He also noted that M.S. blocked him on Facebook and deactivated one of her phone numbers, but he contacted her using her new phone number, which he got from Ms. Betford, and by talking to M.S. on three-way calls with Ms. Betford. When questioned by the prosecutor about the inconsistencies in his testimony and his interview with. Det. Jones, Defendant responded evasively and inconsistently. He admitted that, when interviewed by Det. Jones, he “might have changed [his] story a couple times” because he was nervous *1041 about being arrested and going back to prison.
Det. Jones testified as a rebuttal witness. Portions of the recorded statement Defendant made to him- were played for the jury to demonstrate the inconsistencies ■with his testimony at trial, particularly regarding | ^Defendant’s understanding of the status of his relationship with M.S. on the date of this incident and their contact-prior to that date.
On January 16, 2014, a unanimous jury convicted Defendant as charged of forcible rape.
On January 28, 2014, Defendant filed a motion for post-verdict judgment of acquittal, which the trial court denied. Defendant also filed a motion for a new trial based on multiple violations of his constitutional right to a fair trial and requested a copy of his file. He alleged that the trial court improperly ordered that the entire record be sealed and refused to unseal the record. He also contended that the trial court’s order that counsel not give Defendant a copy of-his file'[5] violated the Louisiana Rules of Professional Conduct and his rights to due process and conflict-free counsel. Defendant argued that the state withheld favorable evidence from the defense, i.e., an expert’s hourly rate for testifying and the victim’s counseling records. He also stated that the state gave an improper closing argument that violated his rights under the Confrontation Clause of the Sixth Amendment. Defendant further argued that the trial court misapplied the rape shield law as to deprive him of his right to present a defense. At a hearing held on the same day the motions were filed, the trial court found that the order to seal the record was not in error. The trial court explained that providing a copy of the material to Defendant personally would allow him to disseminate the information around the jail and violate the victim’s rights, but Defendant |17always had the right to review the material while it was in the possession of his attorney. After reviewing its evidentiary rulings at trial and concluding that there were no grounds. to warrant a new trial, the trial court denied the. motion.
At a hearing on the same date, January 28, 2014, the trial court analyzed the La. C; Cr. P. art. 894.1 factors-and sentenced Defendant to serve 25 years at hard labor, the first two years without benefit of probation, parole or suspension of sentence. The state then filed a second felony habitual offender bill of ■ information, stating that, in addition to his January 16, 2014, conviction for forcible rape, Defendant was previously convicted of first degree aggravated - robbery on January 12, 2005." A multiple offender hearing was held on April 17, 2014, and the trial court concluded that Defendant is a second felony habitual offender. After a sentencing hearing on April 28, 2014, the trial court filed written reasons for judgment and resen-tenced Defendant to 55 years at hard labor without .benefit of probation or suspension of sentence.
On May 22, 2014, Defendant filed a motion to reconsider and vacate his unconstitutionally excessive sentence. He contended that the reasons given by the trial court as aggravating factors were inadequate to support the severity of the sentence imposed. He also argued that the additional reasons given by the trial court as .aggravating .factors are improper and that it did not fully consider all mitigating *1042 circumstances. On May 29, 2014, the trial court filed a ruling denying Defendant’s motion. , .
Defendant now appeals.

_yoiscussioN

Sufficiency of.the Evidence

In his first assignment of error, Defendant argues that the evidence presented at' trial was not sufficient to support a conviction of forcible rape. He contends that only M.S. testified that Defendant committed forcible rape and that there are inconsistencies between her testimony and ¡the results of her physical examination and the testimony given by other witnesses at trial. He also contends that M;S.’s allegation of force is not supported by the evidence because her clothes were not torn, the only observed injury was to her lip, she did not have bruises on her. legs or arms and Defendant had no injuries or scratch marks. Defendant alleges that he and M.S. had consensual sex, but that M.S. did not want her mother to know about their relationship. He contends that M.S. is not a credible witness ■ and notes her young age. •
The state argues that the evidence presented at trial was more than sufficient to prove Defendant’s guilt beyond a reasonable doubt. The state contends' that the testimony of M.S. that she and Defendant had vaginal sexual intercourse, the testimony of Nurse Hubbard that she' took bodily fluid samples from M.S. and- the testimony of Ms. Traweek that the DNA of the semen found in M.S.’s vagina matched Defendant’s DNA establish that vaginal sexual intercourse took place between M.S. and Defendant. The state also alleges that M.S.’s testimony established that she was prevented from resisting the sexual intercourse by force or threats of physical violence. |1flThe state also contends that Defendant is not a credible witness as evidenced by his inconsistent statements.
The standard of appellate review for a sufficiency of the evidence claim is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hearold, 603 So.2d 731 (La.1992); State v. Smith, 47,983 (La.App.2d Cir.5/15/13), 116 So.3d 884. See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
Where there is conflicting testimony about factual matters, the resolution of . which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writ denied, 02-2595 (La.3/28/03), 840 So.2d 566, and writ denied, 02-2997 (La.6/27/03), 847 So.2d 1255, and cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004), citing State v. Tolliver, 35,930 (La.App.2d Cir.5/8/02), 818 So.2d 310, and State v. Bacon, 578 So.2d 175 (La.App. 1st Cir.1991), writ denied, 93-0694 (La.3/30/95), 651 So.2d 857. The trier of fact makes credibility determinations and may accept or ¡reject the testimony of any witness. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A reviewing court may not impinge on the fact finder’s discretion unless it is necessary'to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or re *1043 weigh the evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in, part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422. The sole testimony of a sexual assault victim is sufficient to support a requisite factual finding. State v. Watson, 32,203 (La.App.2d Cir.8/18/99), 743 So.2d 239, writ denied, 99-3014 (La.3/31/00), 759 So.2d 69.
La. R.S. 14:42.1 provides, in part:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
Viewing the evidence in a light most favorable to the prosecution, the state presented sufficient -evidence at trial to convict Defendant of forcible rape. Both M.S. and Defendant testified that they had vaginal sexual intercourse on October 6, 2012. M.S.’s testimony is sufficient to prove that Defendant prevented her from resisting by force under circumstances where she reasonably believed that her resistance would not prevent the rape. laiM.S. provided detailed testimony of her efforts to fight off Defendant’s advances, including that she struck him with an aluminum baseball bat as he climbed through the window. She noted that they continued to struggle once he entered the house and that he grabbed her when- she tried to leave- the house., She explained that Defendant prevented her from screaming by putting his hand -across her mouth, and that she attempted to hold her legs together to prevent sexual intercourse, but Defendant forced them apart and-raped her. She stated that Defendant raped -her a second time after pushing her to the floor, slapping her, holding her arms down and punching her in the legs and thighs to force her legs apart. M.S. adamantly denied that she consented to having sex with Defendant. Her testimony remained consistent and was supported by physical evidence and the testimony of other wit-nessés. . Nurse ■ Hubbard testified about the exam she performed on M.S., noting the injury to M.S.’s lip and .redness ¡of her hand. Further, Defendant’s statements and testimony were inconsistent.
- Thus, we find that the evidence presented to the jury at trial was sufficient to prove beyond a reasonable doubt that Defendant is guilty of forcible rape. Therefore, this assignment of error lacks merit.

Other Grimes Evidence,

In his second assignment of error, Defendant argues that the trial' court erred in ruling that the other crimes evidence of the incident in June 2012 was admissible at trial. He contends that this evidence was prejudicial and potentially confusing.
122The state argues that the June 2012 incident has great probative value because it demonstrates that Defendant had a pattern of making forceful, illegal and Unwarranted'entry into M.S'.’s home. The state points out that law enforcement warned Defendant to stay awayfrom'M.S. and her house, so this prior bad act demonstrates Defendant’s intent to commit the crime.
.La. C.E. art. 404(B)(1) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted *1044 in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial • for such purposes,- or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The state- is required to prove that the defendant committed these other crimes, wrongs or acts by clear and convincing evidence. State v. Jackson, 625 So.2d 146 (La.1993), citing State v. Davis, 449 So.2d 466 (La.1984). The probative value of the other crimes evidence must outweigh its prejudicial effect. La. G.E. art. 403.
A trial court’s ruling on the admissibility of other crimes evidence will not .be oyerturned absent an abuse of discretion. State v. Bruce, 47,055 (La.App.2d Cir.5/25/12), 93 So.3d 717, citing State v. Seales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996). The erroneous introduction of other crimes evidence is, subject to harmless-error review. Id., citing State v. Roberson, 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789.
laJn this case, the state filed a 404(B) notice seeking to introduce at trial evidence of a June 2012 incident in which Defendant entered M.S.’s house by climbing through a window after she told him that he could not come into the house. Following a hearing at which M.S. and Ms. Samuels testified) the trial court determined that evidence of this incident would be admissible at trial for the purpose of demonstrating Defendant’s intent.- According to M.S.’s testimony,-the June 2012 incident was substantially similar to the beginning of the October 2012 incident that is the subject of the case sub judice. In both instances, Defendant appeared at M.S.’s house without notice, M.S. denied him entry into the house, Defendant removed a screen on a kitchen window and then climbed through the window to enter the home. Defendant’s conduct demonstrates his willingness to ignore M.S. and Ms. Samuel’s request that he stay away from M.S; and their home. Evidence of the June 2012 incident was probative of Defendant’s intent on October 6, 2012. The trial court did not err in concluding that the probative value of this evidence outweighed any prejudicial effect created by the admission of the evidence.
Accordingly, this assignment of error lacks merit.

Cpl. Sotak’s Opinion of Whether Victim Was Raped

• In his third assignment of error, Defendant argues that the trial court erred in allowing Cpl. Sotak to provide his opinion as to whether M.S. had been raped when it allowed the following testimony:
[Prosecutor]: Corporal Sotak, what were your findings as a result of observing [M.S.’s] demeanor?
[Cpl. Sotak]: That she had been victim of multiple rapes....
| ¡.¿Defendant also argues that the .trial court erred in allowing Cpl. Sotak to testify as to the veracity of M.S.’s complaints. He contends that this testimony impinged upon the province of the jury as fact finder to make a determination about M.S.’s credibility. . .
The state argues that Cpl. Sotak, as a nonexpert, was' entitled to testify as to his opinion pursuant to La. C.E. art. 701, so long as his opinion Was rationally based on his perception and helpful to the determination of a fact at issue. The ■ state *1045 contends that Cpl. Sotak could testify about a natural inference based upon observed facts.
La. C.E. art. 701 provides:
If the witness is not testifying t as an expert, his .testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
(1) Rationally based on the perception of the witness; and
(2) Helpful to a clear understanding of his testimony, or the determination of a fact in issue.
In the case subjudice, Cpl. Sotak’s' opinion that M.S. had been raped based upon his observation of her demeanor was outside the scope of evidence allowed by La. C.E. art. 701. Although his observations that M.S. appeared “disheveled,” had red eyes and a puffy face as if she had been crying and had a swollen lip are clearly admissible, these observations are far removed from his conclusion that M.S. “had been the victim of multiple rapes.” Cpl. Sotak did not witness the event, and his conclusion that, her sexual conduct with Defendant was noneonsensual was not “rationally based on” his observation of M.S.’s appearance. Therefore, we find that the trial court erred in allowing Cpl. Sotak to testify as to his opinion that M.S. had been the victim of multiple rapes.
|2Jn State v. Harris, 97-0300 (La.4/14/98), 711 So.2d 266, the Louisiana Supreme Court addressed the erroneous admission of evidence as harmless error. The Court explained: ( .
Notwithstanding, the erroneous admission of evidence, a verdict will not be reversed if the reviewing court, assuming that the damaging potential of the improperly admitted evidence is fully realized, determines that the error was harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); State v. Wille, 559 So.2d 1321, 1332 (La.1990). “Reversal is mandated only when there is a reasonable possibility that the evidence might have contributed to the verdict.” State v. Wille, 559 So.2d at 1332. (citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Factors to be considered include the importance of the evidence to the State’s case, the presence or absence of additional corroboration of the evidence, and the overall strength of the State’s case. State v. Wille, 559 So.2d at 1332.
In this case, the state’s case rested primarily upon the. testimony of the victim, M.S. The purpose of the erroneously admitted evidence was to bolster M.S.’s testimony and credibility. Notably, Defendant had the opportunity to cross-examine M.S. at length about her statements to Cpl. Sotak and about her trial testimony. M.S.’s testimony .remained consistent throughout the trial and was also consistent with prior statements she gave to law enforcement and the nurse examiner. Her testimony was corroborated by the testimony of the other witnesses at trial and by the physical evidence collected from her person that matched Defendant’s DNA. Further, the jury had the opportunity to hear M.S.’s testimony and determine whether they found her to be a credible witness. The way the prosecutor posed her question to Cpl. Sotak, i.e., “what are your findings as a result of observing [M.S.’s] demeanor,” made the jury aware of the ^foundation for Cpl. Sotak’s opinion. Although the evidence of Cpl. Sotak’s opinion was erroneously admitted into evidence, we find that its admission was harmless beyond a reasonable doubt. There is not a reasonable possibility that the evidence might have contributed to the verdict.
*1046 Accordingly, this assignment of error lacks merit. ,

Accessibility of Discovery to Defendant

In his fourth assignment of error,’ Defendant argues that the trial court erred in ruling that he could not be provided with a copy of discovery materials in order to prepare and assist counsel at trial.,' He contends that the state should have redacted information that identified the victim in the discovery materials so that the materials couíd have been available for his use during trial preparation.
The state argues that the trial court did not err in denying Defendant’s request for a copy of discovery. It notes that Defendant had the opportunity to view his file with his attorney. ■ It contends that Defendant has not shown that he is prejudiced by his failure to obtain and retain a copy of discovery. It further argues that the trial court properly balanced Defendant’s rights and M.S.’s rights as a victim to not have her private information subject to possible dissemination by Defendant.
La.' C. Cr. P. art. 718 provides the general'rule for a defendant’s entitlement to certain documents and tangible objects. Exceptions to this general rule are set forth in La. C. Cr. P. art. 723, regarding certain reports by state agents, and La. C. Cr. P.- art. 718.1, regarding obscenity and | ¡^pornography involving juveniles. These exceptions are not applicable to the case subjudice.
La. R.S. 46:1844. sets forth the basic rights for victims and witnesses. Subsecr tion W-addresses confidentiality of crime victims, who are, among other things-, victims of sex offenses. Subsection W states, in part:
(l)(a) In order to protect the identity and provide for the safety and welfare of crime victims who are minors under the age of eighteen years and-of victims of sex offenses or human trafficking-related offenses,- notwithstanding any provision of law to the contrary, all public officials and officers and public agencies, including but not limited to all law enforcement agencies, sheriffs; district attorneys, judicial Officers, clerks of court, the Crime Victims Reparations Board, and the Department of Children and Family Services or any division thereof, shall not publicly disclose the name, address, or identity of crime victims who at the time of the commission of the offense are minors under eighteen years of. age or of victims of sex offenses or human trafficking-related offenses, regardless of the date of commission of the offense. The confidentiality of the identity of the victim who at the time of the commission of the offense is a minor under eighteen years of age or the victim of a sex offense or human trafficking-related offense may be waived by the victim. The public disclosure of the name of the juvenile crime victim by any public official or officer or public agency is not. prohibited by this Subsection when the crime resulted in the death of the" victim.
(b) In order to protect the identity and provide for the safety and welfare of crime victims who are minors under the age of eighteen years and of victims of sex offenses or human trafficking-related offenses, notwithstanding any provision of law to the’ contrary, an attorney for any party shall be prohibited from publicly disclosing, except during trial, the name, address, or identity of crime victims who at the time of -the commission of the offense are under eighteen years of- age or are victims of sex offenses-or human trafficking-related offenses, regardless of the date of commission of the offense. An attorney may lawfully utilize initials, abbreviations, or «other forms of indefinite descriptions on *1047 documents used in the performance of their duties to prevent the public,disclosure of the name, address, or identity of such crime victims. If the name, address, or identity of such a crime victim must be |gsdisclosed in a motion or pleading, that motion or pleading shall be filed with the court requesting that it be kept under seal, - Failure to comply with the provisions of this Subparagraph shall be punishable as contempt of court.
The issue in this case appears to have arisen at the conclusion of the 404(B) hearing on January 8, 2014, when the following exchange occurred between Defendant’s counsel and the prosecutor:
Mr. MeClatehey: Yes, Your Honor. The supplemental discovery that we were talking, about that was filed Jan- , uary 3rd with the Police reports. ’Can the Defendant have a copy of this?
Ms. Prudhomme: Your Honor, the State would object to Defendant having a copy of any of the discovery, for.it can be circulated amongst other inmates at Caddo Correctional Center,
It does have the victim’s name. This is a rape case. There has been a Protective . Order filed in this case, and this is also a matter that has been brought before the Court before by . Mr. MeClatehey on this case and all cases he has where a protective order is filed.
The trial court stated that the protective order in place allowed defense counsel to disclose the contents of discovery to Defendant, to show it to him and to review it with him, but not to give him a copy. Defense counsel objected.
While a defendant clearly has the right to prepare for trial without undue burden, the legislative pronouncement about the identity of a victim of a sex offense is of substantial importance as well. Although Defendant’s appellate counsel presents the option that Defendant receive a redacted copy of discovery materials, a review of the appellate record suggests that Defendant’s trial .counsel did not make such a request. Defendant’s | gnappellate attorney argues that the district attorney had the responsibility to redact the material, but La.. R.S. 46:1844(W)(l)(b) imposes a like duty on.counsel for any party, including the defendant.
Furthermore, in order to obtain relief for a discovery violation, a defendant must show prejudice. State v. Thompson, 44,176 (La.App.2d Cir.5/13/09), 12 So.3d 1002. Defendant has failed to show any prejudice from the procedure employed. His counsel had access to all discovery materials and was allowed -to show the materials to Defendant and to discuss them with Defendant in preparation for trial. The appellate record does not state whether Defendant and his counsel took advantage of this available procedure. Although Defendant may choose to explore a remedy further through post-conviction relief, the. appellate record does not entitle. Defendant to a reversal on appeal.
Accordingly, this assignment of error lacks merit.

Questioning of Victim’s Prior Sexual Relationship with Defendant

In his fifth assignment of error, Defendant argues that the trial court erred in not allowing trial counsel to inquire of M.S. whether she and Defendant had a sexual relationship prior to October 6, 2012. He admits that his trial counsel made an oral motion rather than a written motion regarding M.S.’s past sexual behavior as required La. O.E. art. 412, but he contends that he should have been allowed to testify as to whether he and M.S. had consensual sex on occasions other than October 6,2012. ,
*1048 The state argues that the trial court did not err in' prohibiting Defendant from testifying as to his alleged prior consensual sexual | ^encounters with M.S. It notes that Defendant failed to file pretrial notice to elicit such testimony; as is required by La. C.E. art. 412, and Defendant was barred from doing so. The state further contends that any testimony as to alleged prior consensual sexual encounters between Defendant and M.S. would have lacked probative value.
Defendants have the right to confront and cross-examine the witnesses against them and to present a defense. La. Const. Art.-1, ■§-16. La. C.E. art. 607 provides, in. part:
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
The right of an accused rapist to present a defense is balanced against the victim’s interests under the rape shield statute, i.e., La. C.E. art. 412, which is meant to protect the victim of rape from having her sexual history made public. State v. Everidge, 96-2666 (La.12/2/97), 702 So.2d 680, citing State v. Vaughn, 448 So.2d 1260 (La.1983). La. C.E. art. 412 provides, in part:
A.
[[Image here]]
(2) Other evidence; exceptions. When an .accused is charged with a crime involving sexually assaultive behavior, evidence of specific instances of the victim’s past .sexual behavior is also not admissi-. ble-except for:
[[Image here]]
(b) Evidence of past sexual behavior with the accused offered by the accused upon the issue of whether or not the victim consented to the sexually assaultive behavior.
[[Image here]]
C. Motion. (1) Before the person, accused" of committing a' crime that involves sexually assaultive behavior ... 'may offer |S1 under Subparagraph (A)(2) ... of this Article evidence of specific instances of the victim’s past sexual behavior, the accused shall make a written - motion in camera to offer such evidence. The motion shall be accompanied by a •written statement of evidence setting forth the names and addresses of persons to be called as witnesses.
(2) The motion and statement of evidence shall be served on the state which shall- make a reasonable effort to notify the victim prior to the hearing.
D; Time for a motion. The motion shall be made within the time for filing pre-trial motions specified in Code of Criminal Procedure Article 521; except that the court shall allow the motion to ' be made at a later date; if the court determines that:
(1) The evidence is of past sexual behavior with the accused, and the accused establishes that the motion was not timely made because of an impossibility arising through no fault of his own;
■ E. Hearing. (1) If the court determines that the -statement of evidence contains evidence described in Subpara-graph (A)(2) ..., the court shall order a hearing which shall be closed to determine if such evidence is admissible. At such hearing 'the parties may call witnesses.
(2) The • victim, if present, has the right to attend the hearing and may be accompanied by counsel.
*1049 (3) If the court determines on the basis of the hearing described in Sub-paragraph (E)(1) that the evidence which the accused seeks to offer- is relevant and that the probative value of such evidenpe outweighs the danger of unfair prejudice, such evidence may be admissible in the trial,to the extent an order made by the court specifies evidence which may be offered and areas with respect to which the victim may be examined or cross-examined. Introduction of such evidence shall be limited to that specified in the order.
[[Image here]]
F. Past sexual behavior defined. For purposes of this Article, the. term “past sexual behavior” means sexual behavior other than the sexual behavior with respect to which the offense of sexually assaultive behavior is alleged.
| ^Comment (b) to La. C.E. art.' 412 provides:
The Louisiana Supreme Court, in State v. Vaughn, 448 So.2d 1260 (La.1984), has indicated that a restriction of a defendant’s offer to introduce testimony as to the victim’s prior sexual history may violate the defendant’s right to confrontation and fair trial. Federal Rule of Evidence 412 addresses this problem by ' explicitly providing for the admissibility of evidence (other than reputation or opinion) of a victim’s past sexual behavior when such evidence “is constitutionally required to be admitted.” This Article, like every Article in this.Code is necessarily subject to constitutional requirements, and it has not been the general practice in this Code specifically to refer to them. See Art. 102, comment (b); comments to Art. 403.
States may adopt procedural rules that bar evidence of a victim’s prior sexual conduct with a defendant when-the defendant fails to give timely notice of his intent to use the evidence. Michigan v. Lucas, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991). In Louisiana, the failure of a defendant to timely file a motion to introduce this sort of evidence has been accepted as justification to exclude the evidence at trial. See, e.g., State v. Kinsel, 00-1610 (La.App. 5th Cir.3/28/01), 783 So.2d 532, writ denied, 01-1230 (La.3/28/02), 812 So.2d 641; State v. Hotoph, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, writs denied, 99-3477, 00-0150 (La.6/30/00), 765 So.2d 1062, 1066; State v. Billings, 93-1542 (La.App. 3rd Cir.5/4/94), 640 So.2d 500, writ denied, 94-1437 (La.10/7/94), 644 So.2d 631. However, in State v. Everidge, supra, the Louisiana Supreme Court reversed a conviction partly based upon an erroneous exclusion of evidence under La. C.E. art. 412 when the defendant showed that the failure to follow the notice .and hearing procedure was no fault of his own. ;
In the case sub judice, Defendant did not adhere to the procedural requirements of La. C.E. art. 412(C) and (D) when he made an oral motion | ^during Defendant’s testimony to present evidence of his past sexual relationship with M.S. Although the preclusion of possibly relevant evidence is a harsh remedy, Defendant has not demonstrated that the failure to follow the notice and hearing procedure was no fault of his own as contemplated in State v. Everidge, supra. It is possible that Defendant’s untimely effort was purposeful trial strategy to not provide the state with notice of his intent to introduce this evidence. Defendant fails to show that he was so prejudiced that the preclusion of this evidence is reversible error.
Accordingly,, this assignment of error lacks merit,

Motion for Neio Trial

In his sixth assignment of error, Defendant.argues that the trial court erred in *1050 denying his motion for new trial. He contends that, for the reasons set forth in assignments of error three and four,- i.e., Cpl. Sotak’s opinion and Defendant’s access to discovery, his motion should have been granted.
La. C. Or. P. art.'851 sets forth the grounds for a new trial and states:'
A, The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the ease the motion shall be denied, no matter upon what allegations it is grounded.
B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur: ,.
(1) The verdict is contrary to the law and the evidence.
(2) The court’s ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.
(3) New and material evidence that, notwithstanding the exercise of reasonable [¡^diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
(4) The defendant has discovered, since the verdict or judgment of guilty, a prej- ' udieial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the deféndant, was not discovered before the verdict or judgment.
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
(6) The defendant is a victim of human trafficking or trafficking of children for : sexual purposes and the acts for which the defendant was convicted were committed by the defendant as a direct result of being a victim' of the trafficking activity.
As addressed previously in this opinion, the assignments of error upon which Defendant bases the instant assignment of error lack merit. Defendant has not met any of the grounds of La. C. Or. P. art. 851; and, therefore, the trial court did not efr in denying his motion for new trial.
. Accordingly, this assignment of error is without merit.

Excessive Sentence and Motion to Reconsider Sentence

In his seventh assignment of error, Defendant argues that the trial court erred in imposing an unconstitutionally harsh and excessive sentence. In his eighth assignment of error, Defendant argues that the trial court erred in denying his motion to reconsider sentence.
Upon error patent review,- we find that Defendant’s complaints are premature because his sentence is indeterminate.
La. R'.S. 14:42.1(B) provides:
Whoever commits ,the crime of forcible rape shall be imprisoned at hard labor for not less than five nor more,, than forty years. At least two years of the sentence imposed shall bp without bene- , fit of probation, parole, or suspension of sentence.
La. R.S. 15:5291 states, in part:
A." Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state1 or of the United States, or any foreign ^government of a crime which, if committed in this state would be-a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:
*1051 (1) If the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment shall'be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.
G. Any sentence imposed under the provisions of this Section shall be at hard labor without benefit of probation or suspension of sentence,
In this case, the trial court imposed Defendant’s sentence without benefit of probation or suspension of sentence pursuant to La. R.S. 15:529.1(G). However, because the underlying offense of forcible rape requires that at least, two years of the sentence be served without benefit of parole, the habitual offender sentence is to likewise be imposed without parole, State v. Garter, 48,304 (La.App.2d Cir.6/18/08), 987 So.2d 364. La. R.S. 14:42.1 requires an exercise of sentencing discretion; we, therefore, vacate the sentence and remand for resentencing, speeifi-cally for a determination of that portion of the sentence to be served without benefit of parole. M

CONCLUSION

For the foregoing reasons, the conviction of Defendant Robert J. Moody is affirmed. His sentence is vacated, and the matter is remanded to the trial court for resentencing,
CONVICTION AFFIRMED. SENTENCE VACATED. REMANDED FOR RESENTENCING.

. La. R.S. 14:42.1 was amended in 2015 to change the name of the offense from "forcible rape” to "second degree rape.!' The elements of the offense were not amended. La. R.S. 14:42.1(C) expláins:
For all purposes, "forcible rape” and "second degree rape’’ mean the offense defined by the provisions of this Section and any reference to the crime of forcible rape is the same as a reference to the crime of second degree rape;' Any act in violation of the . provisions of this Section committed on or after August 1, 2015, shall be referred to as “second degree rape”.

. To protect her privacy, the victim will be , referred to by her initials, M.S., pursuant to ’ La. R.S. 46:1844(W).

. Perineal is-incorrectly referred to in the trial transcript as ‘'peroneal.”

. Cpl. Sotak is referred to as Cpl. '‘Sotag’1 in Det. Jones's testimony.

. Because of the classification of this crime as a sex offense and because the victim was a minor, the trial court had previously sealed parts of the record and only permitted Defen- . dant to personally view the material while in the presence of his attorney and allowed Defendant’s attorney to discuss the material with his client,