752 So.2d 934 (1999)
STATE of Louisiana
v.
Michael A. LAWRENCE.
No. 98-KA-0348.
Court of Appeal of Louisiana, Fourth Circuit.
December 1, 1999.
*936 Sherry Watters, Louisiana Appellate Project, New Orleans, Louisiana, Attorney for Defendant/Appellant, Michael A. Lawrence.
Harry F. Connick, District Attorney, Nicole Barron, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, Attorneys for Appellee, The State of Louisiana.
Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY and Judge ROBERT A. KATZ.
MURRAY, Judge.
Michael A. Lawrence appeals his convictions for forcible rape and aggravated crime against nature, as well as his sentences as a second felony offender on both counts. We affirm for the reasons that follow.

FACTS
On the evening of April 13, 1993, twelve-year-old D.M. told her mother, Vita, and then her stepfather, Henry, that Uncle Michael had sexually abused her on several occasions within the past six months.[1] Vita called D.M.'s pediatrician, Dr. Janet D. Barnes, who agreed to see them the next day. Both Vita and Henry then went to his father's house to confront his brother, Michael Lawrence, who denied the accusations.
The next morning, Vita took D.M. to make a police report.[2] Detective Cathey Carter of the New Orleans Police Department's Rape and Child Abuse Division spoke with D.M. alone, then interviewed each of the child's parents. She immediately arranged for D.M. to be examined by Dr. Katheryne A. Coffman, Director of the Sexual Abuse Clinic at Children's Hospital, the next week. Det. Carter also scheduled an interview with Michael Lawrence.
*937 After their meetings with Det. Carter, D.M. and her parents went to see Dr. Barnes, who had last treated the child in May 1992 for nervous stomach. Dr. Barnes spoke with each of them alone, beginning with Vita, then D.M., and ending with Henry, summarizing their accounts as she went along. She then performed a limited pelvic exam, cut short by D.M.'s discomfort, and took some tissue samples for lab testing.
The defendant, Michael Lawrence, voluntarily met with Det. Carter at her office on April 19, 1993. After executing a Waiver of Rights form, Mr. Lawrence again denied doing anything of a sexual nature to or with D.M.. He acknowledged being alone with her several times since Fall 1992, and could not explain why D.M. would make up such accusations. At the conclusion of this interview, Det. Carter arrested Michael Lawrence.
Although D.M. had been scheduled to see Dr. Coffman the week of April 19th, a confrontation with a family member resulted in the postponement of that visit until April 30, 1993. Dr. Coffman spoke with D.M., then with her mother, then did a complete physical, including a pelvic exam, tissue swabs from the vagina and throat, and blood and urine samples. After completion of the examination, Dr. Coffman obtained permission to send a copy of her report to Det. Carter and D.M.'s counselor, but made no treatment recommendations.
In the year between these events and the April 1994 trial of this matter, D.M. finished the school year with her classmates, but transferred to another school in Fall 1993. Despite four months of counseling, her behavior continued to trouble her parents, who described her as moody and withdrawn since January 1993. In addition, she felt alienated from her grandfather, and the family's relationships with Henry's relatives were strained.

ASSIGNMENTS OF ERROR
In his first three assignments of error, Mr. Lawrence asserts four issues regarding the admissibility of testimony. As to each, he maintains that the prejudicial effect of the erroneous admission contributed to the guilty verdicts rendered in the case and thus necessitate reversal of his convictions. We will first determine whether each complaint has merit before deciding whether any such errors, separately or together, require reversal.

OPINION TESTIMONY BY POLICE OFFICER
In his first assignment of error, Mr. Lawrence contends that Det. Carter, who was presented at trial merely as an experienced officer rather than as an expert, was nevertheless allowed to express her opinion regarding D.M.'s credibility as well as his own. He argues that the admission of this testimony, over defense counsel's repeated objections, was especially egregious in light of the ruling in State v. Foret, 628 So.2d 1116 (La.1993), that even an expert may not testify as to his assessment of a sexual abuse victim's credibility.
The State counters that Det. Carter testified only that she perceived D.M.'s statements in the interview to be "consistent and detailed," which is admissible under Code of Evidence article 701 because it was based upon the officer's knowledge and experience. Thus, while acknowledging that credibility determinations lie solely with the trier of fact, the State contends that nothing improper was elicited from this lay witness that would require reversal of the convictions.
At trial, Det. Carter first summarized her experience as a child sexual abuse investigator and, over defense counsel's objection, the usual methods she used when interviewing alleged victims. She explained that she asked if they knew the difference between telling the truth and telling a lie, and that she looked for eye contact with the child, consistency as well as age-appropriate descriptions of the acts involved, and expressions of certain emotions, *938 such as embarrassment and fear. Despite additional objections by the defendant, Det. Carter was then permitted to "describe how [D.M.] came across" during her interview with the child, with specific references to eye-to-eye contact, a disturbed and embarrassed emotional appearance, the inclusion of details, and consistency as to content.
While still on direct examination, Det. Carter was similarly asked to "describe the defendant's appearance" at his interview. Defense counsel again objected, arguing that the prosecutor's question was "a subtle way of getting this witness to tell the ... jury her opinion of his veracity." However, the court overruled the objection, and again permitted Det. Carter to testify regarding her subject's demeanor. Using the same criteria as above, the officer stated that Mr. Lawrence "did not make any eye contact" during the interview, that "his facial expression was blank," and that he spoke in a normal conversational tone, with no "shouting" or "yelling" in his denial of D.M.'s accusations.
Article 701 of the Code of Evidence permits a police officer to express an opinion regarding matters of personal knowledge gained through experience, even if the witness is not first qualified as an expert. State v. Lowery, 609 So.2d 1125, 1128 (La.App. 2d Cir.1992), writs denied, 617 So.2d 905 (La.1993). However, the testimony at issue here was not an opinion based upon personal knowledge, but instead was directed at establishing that D.M.'s demeanor during the interview supported Det. Carter's belief in the child's accusations, while the opposite was true regarding Mr. Lawrence's denials. Thus, although thinly disguised, this testimony concerned the credibility of witnesses, which is an issue governed by Code of Evidence articles 607 and 608. These provisions restrict attempts to support credibility as well as to attack it. State v. Babin, 93 1361, p. 8 (La.App. 1st Cir.5/20/94), 637 So.2d 814, 819, writ denied, 94-1563 (La.10/28/94), 644 So.2d 649.
Evidence Code article 607 B specifies that "the credibility of a witness may not be supported unless it has been attacked," and Article 608 A limits the evidence admissible for this purpose to that regarding the general reputation for truthfulness. In this case, D.M.'s credibility had not been attacked before Det. Carter took the stand as the second witness at trial. She acknowledged on cross examination that she had never met either D.M. or Mr. Lawrence before, and thus had no personal knowledge of either their general reputations in the community nor their usual expressions of emotion. Therefore, we find no basis for the admission of Det. Carter's testimony concerning either witness' demeanor or reactions during the interviews.
We thus find that the trial court erred in overruling the defendant's objections to these portions of Det. Carter's testimony.

DOCTORS' HEARSAY TESTIMONY
Mr. Lawrence next asserts that neither Dr. Barnes nor Dr. Coffman should have been allowed to detail what D.M. told them because none of the requirements for an exception to the hearsay rule were met. He argues that because neither doctor testified that any medical treatment was prescribed as a result of their interviews and exams, the hearsay exception of Article 803(4), under which they were offered, did not apply.
In response, the State notes that neither physician testified that D.M. said Michael Lawrence had abused her, but only that she said it was an adult male who was known to her. The State further asserts that while both doctors summarized D.M.'s account of what had been done to her and when, all such details were pertinent to a complete examination and diagnosis, and were thus admissible under the hearsay exception for statements made for medical purposes, Article 803(4).
*939 At trial, Dr. Coffman testified as an expert in pediatrics and child sexual abuse. She explained that in cases of alleged sexual abuse, it is important to know what acts the perpetrator committed in order to determine what tests should be performed for sexually transmitted diseases. During in camera questioning directed at the admissibility of further testimony, Dr. Coffman stated that the sex of the assailant would also be a determinant of further treatment, and that, as a pediatrician with a duty towards all children, she would want to know the perpetrator's identity to determine whether it was someone who still posed a threat to her patient or to others in the community.
Dr. Coffman then summarized for the jury the history and examination results obtained on April 30, 1993. She testified that during her one-on-one interview, D.M. reported that the perpetrator, an adult male known to her, began by "looking funny at her, progressed to rubbing up against her and then subsequently four episodes of penile vaginal intercourse and one episode of penile oral contact." The child also stated that her assailant had ejaculated on at least one occasion and had said he was doing this because he wanted to kill her. D.M. denied any voluntary sexual activity.
Dr. Coffman testified that she then performed a complete physical on D.M., including a pelvic exam, with the child's mother, Vita, in the room. This examination revealed a typical adolescent hymen with no signs of acute trauma. However, D.M. had "a generous-sized vaginal opening" as well as an outward fold in the bottom of her hymen. Dr. Coffman stated that while these conditions could reflect the child's "normal state," the physical findings alone led her to conclude that it was more likely than not that D.M. had had sexual intercourse, "but I would never say that she had been sexually active." She acknowledged that she could neither declare with certainty that the child had been sexually abused nor that Mr. Lawrence was the perpetrator, but she found that the physical exam and the history given, including Vita's description of D.M.'s recent behavior and stomach complaints, were all consistent with her conclusion that the child was the victim of sexual abuse.
On cross examination, Dr. Coffman explained that difficulty arises in detecting signs of sexual activity in an adolescent girl because hormonal changes create a very broad range of what is "normal," and because the physician usually does not have a previous description on which to base a comparison. Nevertheless, if she were to rely solely upon her physical examination in this case, Dr. Coffman testified she "would bet with fifty percent, greater than fifty percent probability that [D.M.] had experienced something previously.... but I wouldn't be willing to go up to [a] sixty-five" percent probability that intercourse had occurred.
The testimony of Dr. Barnes, an expert in pediatrics, was presented next. Dr. Barnes stated that D.M. told her she had been molested twice: "One was somewhat of an attempt, partial [vaginal] penetration and the second one was described as a complete penetration that hurt." The latter incident was said to have been in January, when her parents were out of town, and resulted in "some white stuff" coming out. The doctor began a vaginal exam using a cotton swab, but the child pulled back and made a comment that it felt similar to what the perpetrator had done to her. Therefore, Dr. Barnes decided not to use a speculum, and instead merely used cotton swabs to obtain tissue samples for testing.
Article 803(4) of the Code of Evidence provides that even though a declarant is available for trial, the hearsay rule will not exclude testimony concerning out-of-court statements that are:
Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present *940 symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
The comments under this statute specify that it "follows Federal Rule of Evidence 803(4) but .... excludes from its coverage statements made solely for the purpose of diagnosis."
This court considered the scope of this hearsay exception under circumstances similar to those here in State v. Coleman, 95-1890, pp. 4-6 (La.App. 4th Cir.5/1/96), 673 So.2d 1283, 1286-87, writ denied, 97-0042 (La.10/31/97), 703 So.2d 11.[3] After reviewing the jurisprudence under this Article, as well as cases arising prior to the adoption of the Code of Evidence, it was held that the extent to which a physician's hearsay testimony is admissible under this exception must be determined by the purpose of the examination at issue. The Coleman court concluded that, under the facts presented there, the doctor should not have been permitted to testify as to the events described by the victim and her mother because:
Although a subsidiary purpose of Dr. Coffman's evaluation was to identify and treat any sexually transmitted diseases or other physical harm that may have resulted from rape, the principal reason for the examination was forensic. [The victim] was referred to Dr. Coffman by the District Attorney eighteen months after the rape was alleged to have occurred.... The report of the examination was provided only to the District Attorney. [The victim] received no treatment as a result of [this] evaluation.
While it was thus determined that the hearsay was inadmissible, the error was held to be harmless when viewed against the entire record.
In this case, Det. Carter testified that she referred D.M. to Dr. Coffman for an examination as part of her usual procedure because "[w]hen there's a case like that where there's maybe some type of trauma from a penetration ... we contact the doctor." Similarly, the prosecutor acknowledged during the in camera proceedings that the primary purpose for the referral was to determine if sexual abuse had occurred "along with" treating the child, if necessary. Dr. Coffman's report, admitted into evidence as exhibit S-1, reflects that the patient had been referred by the police "for evaluation of alleged sexual abuse;" that consent was obtained to send the report to Det. Carter and D.M.'s therapist, but not Dr. Barnes; and that lab tests were performed but no further treatment or follow-up was expected. In fact, Dr. Coffman acknowledged that D.M. and her mother said that Dr. Barnes had already obtained cultures for testing at the exam two weeks earlier.
The evidence thus establishes that although Dr. Coffman testified that an accurate and detailed history was generally necessary to treat victims of sexual abuse, this was not the primary purpose of her examination in this case. Instead, as in Coleman, the history was taken in conjunction with an attempt to determine if scientific evidence existed to confirm the child's allegations. Because Article 803(4) permits the admission only of hearsay statements necessary for medical treatment, or for a diagnosis in connection with treatment, Dr. Coffman's testimony regarding D.M.'s account of the events at issue was erroneously admitted at trial.
In contrast, the evidence regarding Dr. Barnes' examination compels the conclusion that her testimony as to D.M.'s out-of-court statements was properly admitted under Article 803(4). Vita contacted Dr. Barnes immediately for professional advice in helping her daughter, and the child was examined the next day to determine *941 whether any physical injury or disease had resulted from the assaults. Although the doctor did not testify in detail about the tests and treatment she ordered, D.M.'s medical records were admitted into evidence.[4] These records establish that the child was tested for HIV and other sexually transmitted diseases, and that Vita was notified of the results three days later. Additionally, the records demonstrate that as a result of Dr. Barnes' interview and examination, she referred D.M. to a therapist for psychological counseling. Therefore, D.M.'s statements to Dr. Barnes regarding the assaults by Mr. Lawrence were made for purposes of medical treatment and were thus properly admitted under the hearsay exception of Article 803(4).
Although Dr. Barnes' hearsay testimony was admissible, the trial court erred in permitting Dr. Coffman to repeat what she had been told during her interview with D.M..

DOCTORS' OPINIONS REGARDING CREDIBILITY
In conjunction with the assignment of error just discussed, Mr. Lawrence further contends that, like Det. Carter, both doctors were allowed to bolster the victim's credibility by testifying that they found her story "consistent with abuse." He argues that under State v. Foret, supra, such expert testimony is admissible only after the victim has testified, and must be limited to only general explanations for any delay in reporting or the omission of details. Mr. Lawrence maintains that the trial court erred in overruling his objections because the testimony of both doctors exceeded those substantive restrictions and was presented to the jury before D.M. had been subjected to cross examination.
In Foret, 628 So.2d 1116, our Supreme Court held that a child psychologist should not have been permitted to testify that in his expert opinion, the alleged victim of sexual abuse was telling the truth. The court found that the Child Sexual Abuse Accommodation Syndrome (CSAAS), referenced as a basis for the expert's opinion, was not scientifically reliable and, even if scientifically valid, could not be used as a basis for an opinion regarding the credibility of an alleged victim. Although it was thus determined that an expert assessment of credibility was improper, the court emphasized that not all expert testimony regarding victims of sexual abuse was inadmissible:
The proper presentation of this sort of expert testimony must focus on explaining to a jury why "superficially bizarre" reactions such as delayed reporting, etc. take place in such cases. The opinion testimony must "seek to demonstrate or explain in general terms the behavioral characteristics of child abuse victims in disclosing alleged incidents," without giving "testimony directly concerning the particular victim's credibility." If the testimony is limited in this fashion, then it is of assistance to the jury....
Id. at 1130 (citations omitted). While the court noted that such testimony was relevant because it "is being offered to rebut attacks on the victim's credibility," id., there was nothing stated to suggest that admissibility was contingent on a prior cross examination of the victim, as Mr. Lawrence contends.
In the instant case, Dr. Coffman's testimony as an expert in child sexual abuse was within the limitations established in Foret. She testified in general terms about the range of behavioral changes often seen in such victims, and discussed the possibility of a delay in reporting incidents of abuse and/or a child's tendency to reveal details gradually. In addition, on both direct and cross examination, Dr. Coffman emphasized the variance that could exist *942 between the reactions of different children, as well as the circumstances under which a child may make false accusations of sexual abuse. Her testimony was explicitly based solely upon her own clinical experience, without reference to the CSAAS or other "scientific" methodology.
Similarly, the expert testimony presented by Dr. Barnes in this case was fully admissible under the Foret standards. While she testified that D.M.'s anxious and embarrassed demeanor in April 1993 was unlike the joking child she had seen in the past, this comparison was clearly based upon Dr. Barnes' personal knowledge of her patient rather than any profile of a "typical" victim of sexual abuse. Furthermore, on cross examination Dr. Barnes acknowledged that some elements of D.M.'s behavior, such as keeping her head down and making limited eye contact, could be indicative of lying. In addition, defense counsel elicited significant details of D.M.'s earlier stomach problems, which had been linked to stress pre-dating the incidents now alleged, and thereby provided an alternate explanation for the behavioral changes asserted to be a sign of sexual abuse.
We thus find no error in the admission of the expert testimony by Dr. Coffman and Dr. Barnes.

HEARSAY TESTIMONY BY VICTIM'S MOTHER
In his third assignment of error, Mr. Lawrence asserts that D.M.'s mother, Vita, should not have been permitted to tell the jury what her daughter told her on the evening of April 13, 1993. He contends that the child's statements to her mother were not admissible under the "initial report" hearsay exception of Article 801 D(1)(d) of the Evidence Code because D.M. told Vita's niece about what had been done to her before she told Vita. The defendant further argues that even if Vita was the first person D.M. told about the assaults, it must also be shown that this initial report was an "excited utterance," made at the first reasonable opportunity for a complaint, before the hearsay exclusion will apply.
Evidence Code article 801 D(1)(d) excludes from the definition of hearsay any statement that is the initial complaint of a sexual assault, if the declarant testifies at trial and the out-of-court statement is consistent with the declarant's trial testimony. Contrary to Mr. Lawrence's argument, there are no additional requirements as to timing or spontaneity for such a statement to be admissible. State v. Valentine, 95-0970, p. 6 (La.App. 4th Cir.1/19/96), 668 So.2d 383, 387, writ denied, 97-2011 (La.2/13/98), 706 So.2d 988; State v. Moran, 584 So.2d 318 (La.App. 4th Cir.), writ denied, 585 So.2d 576 (La.1991).
In this case, Vita testified that after D.M. had spent the night of April 12th with Vita's niece, the niece reported that D.M. "was in a room crying by herself and that the whole time she was there, she wasn't acting like [herself].... [M]y little niece said [D.M.] had been crying and that she wouldn't tell her what was wrong." After hearing this, Vita called D.M. from work and pleaded for her to say what was wrong, but the child insisted it was "nothing." However, because D.M. sounded so "quiet" and had been distant and withdrawn since mid-January, Vita left work and picked her daughter up earlier than usual. It was later that evening, as Vita and her daughter drove to pick Henry up from work, that D.M. finally disclosed that "[m]y daddy's brother, Michael," had been touching her "private parts." Vita then recounted her daughter's description of being raped in January 1993, when the parents were out-of-town, and a later incident when Mr. Lawrence forced his penis into the child's mouth.
The record thus establishes that D.M.'s statements to Vita constituted the initial complaint of Mr. Lawrence's sexual assaults, with no evidence that D.M. had previously told anyone else of the incidents. Additionally, Vita's testimony was entirely consistent with D.M.'s description of the defendant's conduct, presented to *943 the jury just before the mother took the stand. Therefore, there was no error in the admission of this testimony.

HARMLESS ERROR DETERMINATION
Mr. Lawrence asserts that in this case, as in Foret, there was no physical evidence to support the accusations against him, leaving the jurors to decide his guilt or innocence based solely upon whether they believed D.M.'s testimony or his own. Thus, because the inadmissible testimony presented in this case bolstered the victim's credibility and usurped the jury's essential function of determining credibility, the defendant maintains that his convictions must be reversed and a new trial ordered.
In determining that the erroneous admission of testimony does not require reversal of a conviction, the reviewing court must be convinced that the error was harmless beyond a reasonable doubt. State v. Hawkins, 96-0766, p. 5 (La.1/14/97), 688 So.2d 473, 478.
Factors to be considered ... include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."
State v. Wille, 559 So.2d 1321, 1332 (La. 1990) (citations omitted).
Upon consideration of these factors and the record as a whole, we find that the erroneously admitted testimony presented in this case was harmless beyond a reasonable doubt. Contrary to Mr. Lawrence's assertion, the prosecution's case did not rest solely upon the reliability of D.M.'s accusations, but was supported by Dr. Coffman's medical findings that indicated the twelve-year-old, pre-adolescent child had had intercourse. In addition, both of D.M.'s parents testified regarding behavioral changes that began in late 1992, when Mr. Lawrence's conduct allegedly became a threat to the child. These changes became more pronounced after the parents' trip in January 1993, when D.M. had been left alone at her grandfather's house with the defendant. Dr. Coffman testified that, based upon her clinical experience, victims of sexual abuse are often unable to immediately report what has happened to them, and instead become withdrawn and distant, as described in this case. Thus, D.M.'s compelling account of Mr. Lawrence's sexual assaults was corroborated by other significant evidence.
Defense counsel was fully permitted to challenge this evidence, including the testimony now found inadmissible. On cross examination, Det. Carter acknowledged that children of different ages can present vastly different, and personalized, reactions to her interviews, as well as her lack of familiarity with any of those involved in this case. Furthermore, both D.M. and Mr. Lawrence later appeared as witnesses and the jurors were properly instructed that they were entitled to make their own assessments as to the credibility of all those who testified. Similarly, Dr. Coffman's inadmissible testimony was only a brief summary of what she had been told by D.M., and was cumulative of the more detailed accounts provided by the victim and her mother.
Thus, considering both the improper "opinion" testimony as well as the inadmissible hearsay in context of the entire three-day trial, this court is convinced beyond a reasonable doubt that the errors did not contribute to the guilty verdicts rendered in this case. Therefore, Mr. Lawrence's convictions must be affirmed.

SENTENCING ERROR
In his final assignment of error, Mr. Lawrence argues that the trial court erred in sentencing him as a second felony offender for both forcible rape and for aggravated crime against nature. He contends that under State v. Desdunes, 576 *944 So.2d 520 (La.App. 4th Cir.), writ granted on other grounds, 577 So.2d 1011 (La. 1990), sentences for convictions entered on the same day can be enhanced under R.S. 15:529.1 only if the offenses are charged in separate bills of information. Because only one bill of information was filed in this case to charge him with both offenses, Mr. Lawrence asserts that his enhanced sentence on one of the convictions must be vacated, and his trial counsel must be found ineffective for failing to raise this error in a motion to reconsider sentence.
Mr. Lawrence's reliance on Desdunes is misplaced. Although that defendant's enhanced sentences were affirmed with a mention that separate bills of information were involved, 576 So.2d at 528, it was not held that the offenses at issue had to be charged in separate bills in order to permit sentencing under the multiple offender statute. Indeed, as more recently explained, the Supreme Court's interpretation of R.S. 15:529.1 in State ex rel. Porter v. Butler, 573 So.2d 1106 (La. 1991), prohibits sentence enhancement of same-day convictions only if those offenses arose from a single incident or event. State v. Ward, 94-0490, pp. 8-14 (La.App. 4th Cir.2/29/96), 670 So.2d 562, 566-69, writ denied, 97-0642 (La.9/19/97), 701 So.2d 165.
In the instant case, the evidence clearly establishes that Mr. Lawrence was charged with, and found guilty of, two separate and distinct offenses committed on two separate occasions, although both crimes were against the same victim. Furthermore, it is undisputed that prior to the commission of these 1993 offenses, Mr. Lawrence had pled guilty in 1986 to at least one felony.[5] Therefore, his sentence for each of the convictions at issue here was properly enhanced under R.S. 15:529.1 A(1)(a). Under these circumstances, Mr. Lawrence's trial counsel was not ineffective for failing to file a motion to reconsider the sentences imposed after the multiple offender adjudication.
The court finds no errors patent.

CONCLUSION
For the reasons assigned, Mr. Lawrence's convictions and sentences for forcible rape and aggravated crime against nature are affirmed.
AFFIRMED.
NOTES
[1] In order to preserve the minor victim's anonymity, only her initials will be used, in accordance with court policy. For the same reasons, the victim's relatives will be referred to by first name only. Additionally, because the father of the victim in this case is deceased and she considers her mother's husband to be "her Dad," we will not refer hereafter to the step-relationships among those involved except where significant.
[2] Vita testified that she thinks she called the police shortly after she learned what had happened, but Dr. Barnes suggested that D.M. should be allowed to get a good night's rest before any official report was made.
[3] Although the physician's name in Coleman is shown as "Dr. Catherine Coffman," it appears that this is the same Dr. Coffman who testified in the instant case, spelling her first name as "Katheryne" for the court reporter.
[4] Significantly, Mr. Lawrence's trial counsel referred to these records during the pre-trial hearing on the scope of admissible testimony by each doctor, arguing that the contrast between Dr. Barnes' role and that of Dr. Coffman demonstrated that the latter physician's testimony was inadmissible.
[5] At the sentencing hearing, it was asserted that Mr. Lawrence had pled guilty to two offenses in one Orleans Parish case on February 25, 1986 and to three Orleans Parish cases involving multiple counts on March 26, 1986.