STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-742


STATE OF LOUISIANA

VERSUS

RYAN ODELL JIMMERSON


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 341,109
HONORABLE LOWELL C. HAZEL, DISTRICT JUDGE

**********

**JOHN E. CONERY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Chief Judge, John E. Conery, and Charles G. Fitzgerald, Judges.


**CONVICTION AND SENTENCE VACATED.**
**REMANDED FOR NEW TRIAL.**

**J. Phillip Terrell, Jr.**
**District Attorney**
**Catherine L. Davidson**
**Special Counsel, Appellate Division**
**Ninth Judicial District**
**Post Office Box 7538**
**Alexandria, Louisiana  71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Gwendolyn K. Brown**
**Louisiana Appellate Project**
**P.O. Box 64962**
**Baton Rouge, Louisiana  70896**
**(225) 229-6311**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Ryan Odell Jimmerson**

**Ryan Odell Jimmerson**
**In Proper Person**
**Louisiana State Prison**
**17544 Tunica Trace**
**Angola, Louisiana  70712**

**CONERY, Judge.**

In January 2019, the State indicted Defendant, Ryan Odell Jimmerson (born 5/5/92), for the alleged first degree rape of A.M.S.[1] (born 2/8/08). A Rapides Parish jury heard the matter over two days in August 2021 and unanimously convicted Defendant as charged. The trial court denied Defendant's Motion for New Trial and thereafter sentenced Defendant to serve life at hard labor without benefit of probation, parole, or suspension of sentence. Defendant timely appealed. For the following reasons, we vacate Defendant's conviction and sentence and remand this matter for a new trial.

## FACTS AND PROCEDURAL HISTORY

Jacqueline Session, A.M.S.'s mother, testified at trial that she dated Defendant for a number of years. For a time, Defendant lived with Ms. Session and her two children, son Tyler and daughter A.M.S. Ms. Session explained that she asked Defendant to move out of her home in 2015 after he fathered a child with another woman. Ms. Session and Defendant, however, maintained an on-again-off-again relationship. According to Ms. Session, Defendant continued to assist the family financially and, at times, he would care for the children while she was at work.

Ms. Session stated that her children informed her on October 24, 2018 of the alleged rape of A.M.S. Earlier that day, Tyler stated to her that he understood why she did not allow boys in A.M.S.'s bedroom. When Ms. Session asked Tyler why, he responded "because of what Ryan did to [A.M.S.]" Ms. Session explained that after she asked A.M.S. what Ryan had done, A.M.S. replied that Defendant "put a towel over her face and was hunching [sic] her."

---

[1] The victim's initials are used in accordance with La.R.S. 46:1844(W).

Ms. Session testified that she immediately "packed the kids in the car" and that her initial intent was to kill Defendant. She stated, however, that "God … made [her] car go to the police station."

Alexandria Police Officer Anthony Clayton took the initial complaint after the family's arrival at APD. He explained that Ms. Session informed him that Defendant had raped her daughter. The matter was thereafter assigned to Sergeant Michael C. Stroud, who met with Ms. Sessions that same evening. Sergeant Stroud explained that he ultimately determined the alleged conduct occurred in the "August, September range of 2017." Sergeant Stroud arranged for both A.M.S. and Tyler to be interviewed the following day at the Children's Advocacy Center (CAC).

In the recorded interview, then ten-year old A.M.S. explained to forensic interviewer Kirstin Bobbitt that she had been in her mother's room watching a movie when Defendant entered the room. A.M.S. described Defendant to Ms. Bobbitt as a "nasty man" because he "humped a little child like me." A.M.S. stated that "[w]henever he did, I was trying to get him off of me, but then he was holding me down, so I couldn't really do anything."

A.M.S. reported that the conduct occurred on three different days in three different rooms. A.M.S. explained to Ms. Bobbitt that her "butt" hurt, and that her mother kicked Defendant out because she knew something was going on. A.M.S. also reported that Defendant forced her to "suck his 'D' word" with her "hand," and what came out of Defendant's "'D' word" was "black" and "looked like little seeds." A.M.S. further informed Ms. Bobbitt that Defendant "humped" her in the bathroom after putting a washcloth over her mouth. On this occasion, A.M.S. stated, Defendant made her watch a video of "some people humping." And, on yet another occasion, A.M.S. woke up to find Defendant in her bed. A.M.S. stated that

2

Defendant told her she was lucky that her mother was home. A.M.S. confirmed to Ms. Bobbitt that Defendant acted as their babysitter. Sergeant Stroud observed the interview from the adjacent room at CAC. He testified that the interview was crucial in the investigation.

In addition to the CAC interview, Sergeant Stroud arranged for A.M.S. to undergo a physical examination with Dr. Brian Elkins, a family physician with training in child sexual abuse. Dr. Elkins explained in his resulting report that the "examination was normal and demonstrated no physical evidence of sexual abuse." Dr. Elkins indicated, however, that "a normal exam does not rule out abuse. *Her report of described events were credible to me and are consistent with sexual abuse*." (Emphasis added.)

Sergeant Stroud explained that following Dr. Elkins' exam of A.M.S., he obtained a warrant for Defendant's arrest. Defendant was arrested in November 2018 by State Police.

On January 29, 2019, the State charged Defendant with one count of first degree rape of A.M.S., a violation of La.R.S. 14:42, and twice amended the bill to reflect the allegation that the subject conduct occurred between January 1, 2017 and December 31, 2017. Defendant entered a plea of not guilty to the charge.

When the matter proceeded to a two-day jury trial, Defendant took the stand and denied the allegations. At the close of evidence, defense counsel moved for a mistrial, asserting that the trial court impermissibly permitted the jury to hear opinion testimony from both Sergeant Stroud and Dr. Elkins regarding their assessment of A.M.S.'s credibility. Defense counsel also argued that a declaration of mistrial was required as the State, over defense counsel's objection, was permitted to question Defendant regarding his refusal to give a statement to police during the

3

investigation. The trial court denied the motion. After deliberation, the jury returned a unanimous verdict to the charged offense of first degree rape.

Defense counsel thereafter filed a Motion for New Trial, asserting that the trial court erred in admitting hearsay evidence through the use of the CAC interview video and by questioning as to their opinion on Defendant's credibility that occurred during the testimony of Sergeant Stroud and Dr. Elkins. The trial court heard argument related to the Motion for New Trial at an October 14, 2021 hearing and denied the motion before proceeding with sentencing. The trial court sentenced Defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.

## ASSIGNMENTS OF ERROR

Defense counsel filed the present appeal and assigns the following as error:

1. The trial court erred by admitting into evidence, over the defense's objection, the testimony of police officer Sgt. Michael Stroud that the child victim was telling the truth.

2. The trial court erred by admitting into evidence, over the defense objection, the testimony of expert witness Dr. Brian Elkins that the child victim was telling the truth.

3. The trial court erred by admitting hearsay on the basis that it was admissible because it was offered to prove a police officer's actions in furtherance of his investigation when, in fact, it was offered to prove what others said in regard to offers made to [Defendant] [to] come forward to explain his side of the story (*i.e.* the truth of the matter asserted.)

4. The trial court erred by denying [Defendant's] motion for new trial.

4

## LAW AND DISCUSSION

*Errors Patent*

Pursuant to La.Code Crim.P. art. 920, we have reviewed this matter for errors patent on the face of the record. We find no such errors.

*Testimony as to Credibility*

Combining the first, second and fourth assignments of errors, defense counsel argues that "[t]he trial court erred by allowing into evidence testimony that impermissibly bolstered the credibility of the child witness and spoke to the ultimate issue to be decided by the jury." Defense counsel notes that A.M.S. did not testify at trial, but that the State relied upon the CAC interview instead.

Defense counsel contends that the trial court erred in permitting both Sergeant Stroud and Dr. Elkins to comment on A.M.S.'s credibility in reporting or relating the allegation of rape. Defense counsel asserts that in the face of such testimony, coupled with questioning apprizing the jury of the witnesses' familiarity with sexual abuse victims, Defendant "had no chance at a fair trial . . . ." Moreover, "in the impossibly unlikely event that the jury happened to forget such damning evidence," a copy of Dr. Elkins' report was also admitted. Defense counsel thus maintains in brief that "[t]he trial court's erroneous rulings combined to deprive [Defendant] of his right to have his fate determined by the jury" as these witnesses "improperly and prejudicially testified as to ultimate questions of fact that properly belonged to the jury." Defense counsel contends that the trial court erred in denying Defendant's motion for new trial.

We first note that differing analyses are required for review of the opinion testimony of Sergeant Stroud, a lay witness, and that of Dr. Elkins, an expert. We first turn to that of Sergeant Stroud.

5

Opinion Testimony – Lay Witness

As related below, Sergeant Michael Stroud explained that he was called upon to investigate claims made by A.M.S. because the allegations "seemed to be legitimate." Sergeant Stroud indicated that he was in the observation room during A.M.S.'s CAC interview. The State questioned Sergeant Stroud about the interview as follows:

> Q: All right. Before we play the tape to the jury I'll ask you this. Did you find this interview to be crucial in this particular investigation?
>
> A: I did.
>
> . . . .
>
> Q: . . . . I assume once you view the interview that you will note in your report what you found particularly . . .
>
> A: Yes, sir.
>
> Q: . . . insightful?
>
> A: It - it - it is. I believe it's paragraph three and four in the - in my narrative, . . .
>
> Q: Sure.
>
> A: . . . my supplement narrative is where - pretty much details what went on in the CA[C interviews].
>
> . . . .
>
> Q: And - and - and particularly what's important to you?
>
> A: Yes, sir.
>
> Q: Okay.
>
> A: *There were some particular things that I stated in those paragraphs that were not conducive to being fraudulent.*
>
> Q: Got you. *Is that another way of saying you thought she was telling the truth*?

MR. GUILLOT [Defense counsel]:

Objection, Judge.

A: *That's correct.*

MR. GUILLOT:

Objection. She can't - *he can't speak to her credibility.*

THE COURT:

Yeah, I'll allow - I'll - I'll allow it, but it's been - it's been asked and answered.

(Emphasis added.) Sergeant Stroud was again questioned after the jury viewed the video of A.M.S.'s CAC video.

As a lay witness, Sergeant Stroud's testimony is governed by La.Code Evid. art. 701, which provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

(1) Rationally based on the perception of the witness; and

(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

Citing La.Code Evid. art. 701, this court has explained that "[w]hile we consistently permit a law officer to testify as to matters within his personal knowledge acquired through experience without first being qualified as an expert, only experts are allowed to give opinion testimony in areas of specialized knowledge." *State v. Griffin*, 16-424, p. 31 (La.App. 3 Cir. 4/19/17), 217 So.3d 484, 508, *writ denied*, 17-1027 (La. 3/2/18), 269 So.3d 708. A reviewing court asks two questions in determining whether a trial court properly allowed lay opinion testimony: "'(1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness's observations; and (2)

7

if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error.'" *Id.* (quoting *State v. LeBlanc*, 05-0885, p. 8 (La.App. 1 Cir. 2/10/06), 928 So.2d 599, 603).

The first circuit explained similarly in *State v. Burtis*, 08-0373, p. 2 (La.App. 1 Cir. 9/23/08) (unpublished opinion),[2] *writ denied*, 08-2420 (La. 5/15/09), 8 So.3d 581, noting that La.Code Evid. art. 701 limits a lay witness's testimony in the form of opinions or inferences to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of his or her testimony or the determination of a fact in issue. Addressing a detective's testimony in the matter before it, the *Burtis* panel noted that "[l]ay opinion testimony relating to the credibility of a witness is controlled by La. C.E. art. 608,[3] which permits

---

[2] 2008 WL 4332529.

[3] Louisiana Code of Evidence Article 608 provides:

> **A. Reputation evidence of character.** The credibility of a witness may be attacked or supported by evidence in the form of general reputation only, but subject to these limitations:
>
> (1) The evidence may refer only to character for truthfulness or untruthfulness.
>
> (2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.
>
> (3) Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.
>
> **B. Particular acts, vices, or courses of conduct.** Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.
>
> **C. Cross-examination of character witnesses.** A witness who has testified to the character for truthfulness or untruthfulness of another witness may be cross-examined as to whether he has heard about particular acts of that witness bearing upon his credibility.

evidence to attack or support a witness's credibility in the form of general reputation only, subject to certain additional limitations specified in the article." *Id.* at 2.

Reviewing the scenario in *Burtis*, the first circuit found the contested lay opinion testimony permissible. Namely, the detective offering the testimony, Detective Eppinette, had previously interviewed the victims, as well as several family members, and had consulted with psychologists at the advocacy center where the victims were interviewed. The first circuit thus reasoned that the testimony "was based on [Detective Eppinette's] experience, observations, and interviews conducted and that it was helpful to the determination of a fact in issue." *Id.* at 3. Accordingly, the first circuit found that "[p]ursuant to article 701, Detective Eppinette was entitled to give her opinion as a lay witness as to her perception of the veracity of the victims' statements." *Id. See also State v. Hubbard*, 97-916 (La.App. 5 Cir. 1/27/98), 708 So.2d 1099, *writ denied,* 98-0643 (La. 8/28/98), 723 So.2d 415.

This case is distinguishable from *Burtis*, however. Unlike Detective Eppinette, Sergeant Stroud did not personally interview A.M.S. Rather, as conveyed in the transcript, Sergeant Stroud spoke only with Ms. Session and thereafter testified regarding A.M.S.'s credibility upon having only observed A.M.S.'s interview at the CAC and subsequently reviewing the video recording of that interview. While Sergeant Stroud testified generally regarding his training, his testimony as to his personal knowledge and observations regarding A.M.S. is not developed in detail in the record. This factor is important, as jurisprudence has recognized that, although La.Code Evid. 701 permits a lay witness to testify regarding reasonable inferences from his or her personal observations, the subject testimony must constitute a natural inference from what was observed *and the lay witness states the observed facts as well. See Griffin*, 217 So.3d 484. *See also State v. D.D.*, 18-0891 (La.App. 4 Cir.

9

12/27/19), 288 So.3d 808, *writ denied,* 20-00158 (La. 5/26/20), 296 So.3d 1063. Again, Sergeant Stroud's testimony as to observed facts was limited to the fact that he interviewed Ms. Session and viewed the CAC interview.  To the extent other observed facts existed, they were not developed on questioning.

In this sense, Sergeant Stroud's assessment of A.M.S.'s credibility is akin to the opinion testimony elicited in *State v. Lawrence*, 98-0348 (La.App. 4 Cir. 12/1/99), 752 So.2d 934, *writ denied*, 00-0003 (La. 6/16/00), 764 So.2d 962.  In *Lawrence*, the state questioned a detective, Detective Carter, about the demeanor of both the victim and the defendant during her interviews with them.  The fourth circuit found Detective Carter's opinion testimony impermissible under La.Code Evid. art. 701.  While Article 701 allows an officer to opine as to matters of personal knowledge gained through experience, Detective Carter's opinion was not one "based upon personal knowledge, but instead was directed at establishing that [the victim's] demeanor during the interview supported Det. Carter's belief in the child's accusations, while the opposite was true regarding [the defendant]'s denials." *Id.* at 938.  The panel explained that "although thinly disguised," Detective Carter's testimony "concerned the credibility of witnesses[.]" *Id.*  This latter issue, is "governed by Code of Evidence article 607[4] and 608[,]" both of which "restrict attempts to support credibility as well as to attack it." *Id.* Specifically,

---

[4] Louisiana Code of Evidence Article 607 provides:

> **A. Who may attack credibility.** The credibility of a witness may be attacked by any party, including the party calling him.
>
> **B. Time for attacking and supporting credibility.** The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.

Evidence Code article 607 B specifies that "the credibility of a witness may not be supported unless it has been attacked," and Article 608 A limits the evidence admissible for this purpose to that regarding the general reputation for truthfulness. In this case, D.M.'s credibility had not been attacked before Det. Carter took the stand as the second witness at trial. She acknowledged on cross examination that she had never met either D.M. or Mr. Lawrence before, and thus had no personal knowledge of either their general reputations in the community nor their usual expressions of emotion. Therefore, we find no basis for the admission of Det. Carter's testimony concerning either witness' demeanor or reactions during the interviews.

*Id.*

Similarly, in *State v. Moody*, 50,001 (La.App. 2 Cir. 9/30/15), 178 So.3d 1031, the state argued that the testifying officer, Corporal Sotak, could offer his opinion under La.Code Evid. art. 701 that the victim had been raped several times. The state suggested that his opinion was an inference based on his observation of the victim's demeanor at the time he responded to the scene of the offense. The second circuit rejected that assertion, explaining that, although Corporal Sotak's observations regarding the victim's appearance were clearly admissible under Article 701, "these observations are far removed from his conclusion that [the victim] 'had been the victim of multiple rapes.'" *Id.* at 1045. The panel pointed out that Corporal Sotak

---

**C. Attacking credibility intrinsically.** Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.

**D. Attacking credibility extrinsically.** Except as otherwise provided by legislation:

(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.

(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

did not witness the event, "and his conclusion that [the victim's] sexual conduct with Defendant was nonconsensual was not 'rationally based on' his observation of [the victim's] appearance." *Id.* at 1045.

We similarly find the present matter outside the scope of permissible Article 701 testimony. Notably, as in *Lawrence*, A.M.S.'s credibility had not been attacked before Sergeant Stroud took the stand and, in fact, the jury had not yet viewed the CAC interview at the time he offered his assessment. Instead, the challenged testimony related purely to A.M.S.'s credibility and his own opinion thereof. Again, Sergeant Stroud was not qualified as an expert witness, but testified as a lay witness as to his own observations and perceptions. Moreover, the record does not establish that Sergeant Stroud was previously familiar with A.M.S., nor did he interview her. Rather, his opinion was drawn purely from his interview with Ms. Session and by the viewing of an interview conducted by another.

Given those circumstances, we find that the trial court improperly permitted Sergeant Stroud's opinion testimony as to credibility. That error is subject to a harmless error analysis, as conducted below. *See Griffin*, 217 So.3d 484.

Opinion Testimony – Expert Witness

Defense counsel further objects to the opinion testimony offered by Dr. Brian Elkins, who testified after Sergeant Stroud. The trial court accepted Dr. Elkins as an expert in "primary care occupational medicine with a focus on forensic study and treatment of pediatric sexual abuse victims." Dr. Elkins evaluated A.M.S. on October 30, 2018. Dr. Elkins reviewed his resulting report for the jury, explaining that A.M.S. initially reported to her mother that she had been vaginally, anally, and orally raped by a twenty-five-year-old man. Dr. Elkins testified that his report stated Defendant put his penis in A.M.S.'s "no-no place" and in her "butt." A.M.S.'s

12

physical exam was normal, which he said was to be expected a year after the alleged events.

Dr. Elkins was asked about his "summation," as reflected in the last paragraph of his report. Defense counsel objected and explained to the trial court during a resulting bench conference that: "There is a statement in paragraph say [sic] that goes toward their credibility. And I believe he's going [to] actually read that she was credible in her statement and I think that's inappropriate at this time because . . . [.]" The State countered defense counsel's objection in noting that Dr. Elkins was testifying as an expert and that it related to "the heart of his examin[ation]. His physical experience and history." The trial court overruled the objection, stating "I don't think they are saying absolute to him. If he's conducted a thousand examinations he probably knows some better way out here and some that are tight [sic] right here."[5]

Dr. Elkins then testified as follows regarding the last paragraph or summation section of his report, stating on examination by the State:

> A. Yes. I said this examination was normal and demonstrated no physical evidence of sexual abuse. We note that the examination was somewhat limited by the patient's discomfort with the examination. However, a normal exam does not rule out abuse. *Her report of described events were [sic] credible to me and are consistent with sexual abuse.*
>
> Q: Okay. And I assume as a physician with a history being the most important, it's - *it's pretty important to make that call, whether it's credible or not*?
>
> MR. GUILLOT [Defense counsel]:

---

[5] Defense counsel commemorated the objection for the record after the jury was excused for the day, stating that he had objected to Dr. Elkins "basically saying that he thought the victim, alleged victim, was credible in her statements to him." Defense counsel stated that, "I objected to that based on him making a determination that she was credible or not credible or lying, not lying, whatever you want to call it. That was the objection. It was overruled by the Court, so I just wanted to make sure that we had that [on the record clear.]"

Objection, Judge. We just talked about that.

MR. CESPIVA [Assistant District Attorney]:

But that's what you overruled, so.

THE COURT:

Yeah. I'll note the objection for record [sic]. I'm going to allow Dr. Elkins to answer that.

BY MR. CESPIVA:

Q: *I assume, Doctor, that it's something very important in a thousand exams to note whether you feel the child gave you a credible recount of what happened to her?*

A: *Yes.*

(Emphasis added.)

On cross-examination, defense counsel questioned Dr. Elkins about prior cases he had handled, stating: "You were asked by Attorney Cespiva – well, there was discussion about credibility, how this appeared credible to you. You mentioned a thousand cases, Doctor. Out of the thousand cases how many – do you recall the number that may have not been credible to you?" Dr. Elkins recalled a number of cases in which he felt a child's report was not credible. Dr. Elkins was then asked, "Have you ever testified to that credibility in court before on any of those children, do you recall?" Dr. Elkins responded, "Not that I can think of, no."

Dr. Elkins testified that a normal exam was irrelevant to the overall assessment of whether sexual abuse had occurred. Rather, he indicated the most important piece of information was the "history and my assessment of the credibility[.]" Thereafter, defense counsel objected to the introduction of Dr. Elkins' medical report. The trial court overruled the objection and Dr. Elkins' entire report was admitted into evidence as Exhibit S-5.

In her brief, defense counsel maintains that Dr. Elkins' testimony was precluded under *State v. Foret*, 628 So.2d 1116 (La.1993), and *State v. Chauvin*, 02-1188 (La. 5/20/03), 846 So.2d 697. She couples her concern regarding Dr. Elkins' testimony with that of Sergeant Stroud, asserting that the collective testimony was both prohibited and, ultimately, prejudicial as discussed below.

Louisiana Code of Evidence Article 702 provides the general rule governing admissibility of expert testimony as follows:

> A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

In *Foret*, 628 So.2d 1116, the Louisiana Supreme Court explained that La.Code Evid. art. 702, along with the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), served as useful guidance to courts in considering the admissibility of expert testimony of child sexual abuse. The supreme court explained that even if such expert testimony satisfied the reliability criteria of *Daubert* for scientific validity, the court must still consider "whether or not its use to bolster the victim's credibility was improper so as to unfairly prejudice the defendant." *Id.* at 1127.

The supreme court in *Foret* specifically reviewed the testimony of Dr. William Janzen, Ph.D., an expert in the field of psychology with expertise in child

sexual abuse. The supreme court explained that Dr. Janzen had interviewed the victim several times and concluded in his expert opinion that "she was telling the truth about being the victim of sexual abuse." *Id.* at 1119. Dr. Janzen provided a number of reasons for reaching his conclusion, including the victim's detailed accounts of abuse, her expression of feelings of disgust and sadness, her claim that the defendant was possessive of her, the victim's feeling that she had done something wrong, and the defendant's warning to her that she not inform others of the molestation. *Id.*

Again in *Foret*, Dr. Janzen stated as follows with regard to his methods for evaluation of sexual abuse allegations:

> And then on the basis of what I get from the child, the type of detail that I get from the child to make some conclusions about whether or not what she is telling me suggests that she has been sexually abused, or another way of putting it, on the basis of what I get from the child I make some conclusions about whether or not what she is telling me is consistent with what we know about the dynamics of sexual abuse.

*Id.* at 1119. Dr. Janzen explained that he administered some "emotional tests" in the *Foret* matter, but that those tests did not tell him anything about the allegations. He noted that the victim had a "'flat'" manner and that "she had 'some sadness and unhappiness.'" *Id.* Dr. Janzen thereafter opined that the victim's "'attempts to hide her sadness'" were due to her "'embarass[ment]'" about the abuse and that the victim would prefer that others not know. *Id.*

The supreme court observed that Dr. Janzen then "went into specific details of the allegations made by the victim and, with the court's permission, named the defendant as the person whom the victim identified as her abuser." *Id.* at 1119. Dr. Janzen went on to describe various dynamics of child sexual abuse.

On further questioning, the State inquired: "Doctor, after the interviews you had with [the victim], the testing and the conversations and so on that you had with her, is it your opinion that she was sexually abused?" *Id.* at 1120. Defense counsel objected to the inquiry "claiming that the State was asking the expert to comment upon 'the fact and [sic] issue here'[ . . . .]" *Id.* The trial court overruled the objection, "simply cautioning the doctor not to 'identi[fy] . . . any person who may be responsible.'" *Id.* Following that ruling, Dr. Janzen responded: "The details that she gave me are consistent with the dynamics of sexual abuse and so my conclusion would, therefore, be that she has been sexually abused and should be in counseling to help her cope with that." *Id.* On summation of his testimony of his direct examination, Dr. Janzen noted that in light of the details provided by the victim and considering the various dynamics of sexual abuse, his "'only conclusion' was that the victim had 'been sexually abused.'" *Id.*

The supreme court concluded in *Foret* that Dr. Janzen's testimony was admissible for very limited purposes as follows:

> When dealing with expert testimony, the critical question is "On this subject, can a jury receive appreciable help from this person?" Comment, "Psychological Expert Testimony on a Child's Veracity In Child Sexual Abuse Prosecutions", 50 La.L.R. 1039, 1047, citing 3A J. Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law* § 509 (J. Chadbourne rev. ed. 1978). "Under certain circumstances, expert psychiatric testimony may reveal to the trier of fact characteristics or conditions of the witness which may assist the jury's assessment of credibility." *State v. Kim*, 64 Haw. 598, 645 P.2d 1330, 1334 (1982). The two most prevalent of these characteristics that may confound a jury are recantation and delayed reporting. 50 La.L.R. at 1046. The court in *State v. Myers*, 359 N.W.2d 604, 610 (Minn.1984), summed up the need for an expert to "place it in perspective":
>
>> The nature . . . of the sexual abuse of children places lay jurors at a disadvantage. Incest is prohibited in all or almost all cultures, and the common experience of the jury may represent a less than adequate foundation for

assessing the credibility of a young child who complains of sexual abuse . . . By explaining the emotional antecedents of the victim's conduct and the peculiar impact of the crime on other members of the family, an expert can assist the jury in evaluating the credibility of the complainant.

The proper presentation of this sort of expert testimony must focus on explaining to a jury why "superficially bizarre" reactions such as delayed reporting, etc. take place in such cases. *Wheat v. State*, 527 A.2d 269, 273 (Del.1987). The opinion testimony must "seek to demonstrate or explain in general terms the behavioral characteristics of child abuse victims in disclosing alleged incidents," without giving "testimony directly concerning the particular victim's credibility." *State v. Spigarolo*, 210 Conn. 359, 556 A.2d 112, 123 (1989). If the testimony is limited in this fashion, then it is of assistance to the jury

in evaluating the psychological dynamics and resulting behavior patterns of alleged victims of child abuse, where the child's behavior is not within the common experience of the average juror.

*Wheat*, *supra*, at 275. See also, *Frenzel v. State*, 849 P.2d 741 (Wyo.1993).

The expert testimony on why victims might recant or delay reporting is being offered to rebut attacks on the victim's credibility. *So long as the expert limits the testimony to general characteristics that would explain delays in reporting, recantations, and omission of details, the testimony will not*

*substitute [the expert's] estimation of credibility for that of the jury. Rather, it is to provide a scientific perspective for the jury according to which it can evaluate the complainant's testimony for itself.*

Goldstein, "Credibility and Incredibility: The Psychiatric Examination of the Complaining Witness", 137 Am.J.Psychia. 1238, 1240 (1980).

*Id.* at 1129-30 (emphasis added).

The supreme court distinguished Dr. Janzen's testimony from that limited permissible topic, however, stating:

*In the instant case, the expert testified as to his expert opinion on the victim's credibility, and did not limit his testimony to general information about possible psychiatric explanations for the delay in reporting. In fact, the expert based most of his opinion upon the "level*

*of detail" of the child's description of the sexual abuse. He concluded
with an objected-to summation that, in his expert opinion, the witness
was telling the truth on that occasion as to whether abuse had occurred.
This expert assessment of the witness' credibility was improper, making
the trial court's overruling of the objection erroneous.*

*Id.* at 1130 (emphasis added). On that basis, the supreme court reversed the

defendant's conviction and remanded for a new trial.

The same is true in this case, if not more so. Dr. Elkins' spoke plainly about

his determination that A.M.S.'s reporting of described events was "credible *to me*

and are [is] consistent with sexual abuse." (Emphasis added.)

Defense counsel also references *Chauvin*, 846 So.2d 697, a case in which the

supreme court addressed the admissibility of expert testimony concerning post-

traumatic stress disorder of a sexually abused victim. The contested testimony came

from a licensed clinical social worker, Renee Ring, whom the state called to establish

that A.C.'s clinical symptoms were consistent with a sexual abuse victim. Ms. Ring

was questioned as follows:

> Q. Okay. Let me ask you this. The clinical findings, both subjective
> and objective, that you observed in regard to [A.C.] when you
> treated her for these problems, were those consistent with a child
> who had been sexually abused?
>
> A. Yes, the symptoms were that of post-traumatic stress.
>
> Q. Ma'am, I got a question just in general for you. Is there any way
> that you can predict, based on your experience and education,
> how a child might react to sexual abuse?
>
> A. I mean just by the criteria of post-traumatic stress you don't
> know exactly what symptoms they might have, but there's a
> general knowledge that they could have this, they could have this,
> they could have this.

*Id.* at 700. On cross-examination, defense counsel questioned Ms. Ring as to

whether the cited symptoms could appear in a child having problems other than

sexual abuse. Ms. Ring explained in response that "one would rule out any other

reasons for the disorder and that is how one would make a diagnosis. Also on cross-examination, Ms. Ring acknowledged that the diagnosis was her opinion, and also acknowledged that experts make mistakes." *Id.*

On review of the testimony, the supreme court concluded:

[W]e find that admission of expert testimony of a diagnosis of PTSD for the purpose of substantively proving sexual abuse fails to pass the *Daubert* threshold test of scientific reliability.

Just as we determined in *Foret*, expert testimony of general characteristics that would explain delays in reporting, recantations, and omissions of details is admissible. In the matter before us, there was no evidence in the record that A.C. or A.L. recanted their allegations. Nor were they young children who were cognitively unable to testify coherently or incapable of providing details. *We find Ms. Ring's expert testimony went beyond the limited purpose of explaining the superficially bizarre behavior of a victim of child sexual abuse.*

*Id.* at 708 (emphasis added).

Ms. Ring's testimony, the supreme court explained, "deprived defendant of a fair trial by imbuing the girls' testimony with an undeserved scientific aura of truth. This testimony impermissibly bolstered the testimony of both girls." *Id.* at 708. The supreme court found no indication that Ms. Ring's "testimony was necessary to explain to the jury the significance of a child-witness's demeanor, inconsistent reports, reluctance to testify or recantation." *Id.* at 708.

Given those circumstances, the supreme court concluded that:

[T]he State introduced the expert testimony regarding A.C.'s diagnosis of PTSD *for the purpose of substantively proving that sexual abuse occurred*. There is no indication that the State attempted to limit this evidence to explain delayed reporting, which could be construed as apparently inconsistent with having been sexually abused. There is no showing that PTSD evidence is reliable and accurate as substantive proof of sexual abuse and therefore, it is inadmissible for this purpose. We hold that this evidence, like [Child Sexual Abuse Accommodation Syndrome]-based evidence, should be admissible only for the limited purpose of explaining, in general terms, certain reactions of a child to

20

abuse that would be used to attack the victim/witness's credibility. *Foret*, 628 So.2d at 1131.

*Id.* at 708–09.

As seen in comparison to *Foret* in this case, the State's questioning of Dr. Elkins regarding his assessment of credibility was patently offered to bolster the child victim's credibility and, therefore, runs afoul of *Chauvin* as well. In both *Foret* and *Chauvin*, the supreme court referenced permissible expert testimony regarding child sexual abuse, but explained that such testimony was limited to the type of testimony which could guide the jury in its own assessment of the victim's behavior. That type of nuanced and particularized testimony was not present in this case. Rather, the State's questioning of Dr. Elkins plainly and specifically spoke to A.M.S.'s credibility.

Having found that the testimonies of both Sergeant Stroud and Dr. Elkins exceeded the permissible scope of La.Code Evid. art. 702, we turn to the required harmless error analysis.

Harmless Error

As delineated by the supreme court, "[a]n error is harmless beyond a reasonable doubt if it is unimportant in relation to the whole, and the verdict rendered is surely unattributable to the error." *State v. Brown*, 16-998, pp. 54–55 (La. 1/28/22), _ So.3d _, _[6] *petition for cert. filed* (U.S. July 24, 2022) (No. 22-77).

As advanced by the State, a panel of this court concluded in *State v. Ste. Marie*, 97-0168 (La.App. 3 Cir. 4/18/01), 801 So.2d 424 that, although a social worker's testimony violated *Foret*, the error was nonetheless harmless. Setting *Ste. Marie* apart from this case, however, the panel specifically observed that the problematic

_____

[6]2022 WL 266603.

21

"*testimony was elicited in direct response to defense counsel's questioning.*" *Id.* at 430 (emphasis added). Moreover, the defendant in *Ste. Marie* was tried by a judge, not a jury, and the trial court stated on the record that she "underst[oo]d" the defendant's objection and that she would instruct herself "as the fact-finder here." *Id.* The trial court explained that the social worker was "tying the testimony to the skill and expertise that she has, what that has given her about the patterns that are common, and she is making that tie, *but it remains for me to determine the credibility of their testimony as they tell their story.*" *Id.* (emphasis added). Given that circumstance, the *Ste. Marie* panel concluded that "[s]ince the trial court was well aware that she could not use Ms. Hayes' testimony as a determination of credibility, the error was harmless." *Id.* at 431.

The *Ste. Marie* scenario is simply not present in this case. First, it was the State, not Defendant, which asked Dr. Elkins about the summation paragraph of his report. The State obviously knew that the paragraph, comprised of only four sentences, included his statement as to A.M.S.'s credibility. Exacerbating that error, Defendant was tried by jury, not a judge.

This case also differs from *State v. Murphy*, 34,624 (La.App. 2 Cir. 4/6/01), 785 So.2d 197, *writ denied*, 01-1259 (La. 3/22/02), 811 So.2d 920, a case in which the second circuit determined that an expert's testimony violated *Foret* but that its admission was harmless error. The *Murphy* panel concluded that, even without the expert's statement which violated *Foret*, "a rational trier of fact could find, based on [the defendant's] own statement, that he raped or attempted to rape" the victim. *Id.* at 205. By that statement, the defendant in *Murphy* had acknowledged to investigators that he had "fooled" with the victim, and that he put his "penis between her legs," although he could not recall whether he had penetrated the victim due to

his intoxication. *Id.* at 202. That statement alone, the *Murphy* panel concluded, "was sufficient to prove the elements of the attempted aggravated rape." *Id.*

Again, this case presents a starkly different scenario. Unlike the victim in *Murphy*, A.M.S. did not testify. Rather, the jury heard from A.M.S. strictly through the playing of her recorded CAC interview. Importantly, and again in contrast to *Murphy*, Defendant offered no inculpatory statement. In contrast, Defendant testified at trial, denying A.M.S.'s allegation, denying Tyler's account of his confrontation with Defendant, and suggesting to the jury that he was impotent during the pertinent timeline due to a work-related accident.

Further, this case involves delayed reporting for more than one (1) year, no contemporaneous witness accounts of the alleged offenses, and no physical evidence. Rather, the jury's determination in this case was based purely on credibility. Accordingly, we are unable to determine that the erroneous admission of opinion evidence from both Sergeant Stroud and Dr. Elkins "was unimportant in relation to the whole, and the verdict rendered [was] surely unattributable to the error." *Brown*, _ So.3d at _.

Rather, we find the supreme court's reasoning in *Foret*, 628 So.2d at 1130-31, instructive as it explained:

> In this instance, the state's case was based largely upon the testimony of the victim. The inadmissible expert testimony served to unduly bolster this testimony and, in all probability, made it much more believable to the jury. Consequently, the jury probably gave the testimony of the victim more weight than it, standing alone, would have otherwise received. Given this effect of the expert's testimony, this court is not prepared to state that, beyond a reasonable doubt, the testimony of Dr. Janzen had no effect on the guilty verdict.

As the State's case in this matter was likewise based largely on A.M.S.'s statement in her interview, we find that the combined opinion testimony of both lay

and expert witnesses as to credibility made it more believable to the jury. Accordingly, as did the supreme court in *Foret*, we conclude that Defendant's conviction and sentence must be vacated. By decree below, we remand to the trial court for a new trial.

Defense counsel's remaining assignments of error are rendered moot by the above disposition. We therefore do not further address those issues so as to avoid rendering an advisory opinion. *See State v. Malone*, 08-2253 (La. 12/1/09), 25 So.3d 113 (explaining within the criminal context that courts will not decide moot controversies or render advisory opinions regarding those controversies).

**DECREE**

For the foregoing reasons, Defendant Ryan Odell Jimmerson's conviction for first degree rape and sentence to life imprisonment at hard labor are vacated. This matter is remanded for a new trial.

**CONVICTION AND SENTENCE VACATED.**
**REMANDED FOR NEW TRIAL.**